Larry Ray REEVES, Plaintiff and Appellant,

v.

GEIGY PHARMACEUTICAL, INC., A DIVISION OF CIBA–GEIGY CORP., a New York corporation; Eli Lilly & Co., an Indiana corporation; and Gerald R. Moress, M.D., Defendants and Respondents.

No. 880287–CA.

Court of Appeals of Utah.

Nov. 18, 1988.

Kathryn P. Collard (argued), Salt Lake City, for plaintiff and appellant.

P. Keith Nelson (argued), Salt Lake City, Richards, Brandt, Miller & Nelson, for defendants and respondents.

David B. Watkiss, Tracy H. Fowler, Watkiss & Campbell, Salt Lake City, for defendant and respondent, Geigy.

E. Scott Savage, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for defendant and respondent, Eli Lilly.

Before GARFF, BENCH and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Larry Ray Reeves ("Reeves") appeals from an adverse summary judgment in favor of all respondents. He contends the trial court abused its discretion by denying him additional discovery time in which to obtain affidavits opposing those filed in support of respondents' motions. Alternatively, he asserts the record before the trial court presented a disputed issue of material fact precluding summary judgment. We affirm in part, reverse in part, and remand.

In 1974, while attending the sixth grade, Reeves began experiencing epileptic seizures. He was treated over the next six years by several doctors who, despite the use of different drug regimens that included Phenobarbital, Dilantin, Mesantoin, and Valproic Acid, had difficulty in controlling the frequency and intensity of appellant's seizures. He was eventually referred to respondent Dr. Gerald R. Moress ("Moress"), a neurologist, in August 1980. Moress saw Reeves approximately six times over the next thirteen months, prescribing Dilantin, Phenobarbital, Mesantoin, and Tegretol during this period. At the time of his September 9, 1981 office visit, Reeves was taking both Phenobarbital and Tegretol prescribed by Moress.[1]

On the morning of October 31, 1981, after showering, Reeves noted that the top layer of his skin had started to peel off. He was admitted in shock as an emergency patient to the burn unit at the University of Utah Medical Center. Dr. Glen Warden, a burn specialist and Reeves's primary attending physician from that point, estimated Reeves had lost fifty-five percent of his superficial skin by the time of admission. Although a scalding burn was considered, Dr. Warden made an admission diagnosis of appellant's condition as "toxic epidermal necrolysis" ("T.E.N."), a general term used to describe dermatological disorders that result in blistering and loss of skin to varying degrees. A histological examination two days after admission showed Reeves's skin injury to be full thickness, meaning the dermis as well as the epidermis was destroyed, a symptom atypical of patients diagnosed as suffering from T.E.N. Seven days after Reeves's admission to the burn unit, however, an additional ten percent of his skin blistered and sloughed off, a progression that is characteristic of T.E.N. He remained an inpatient for approximately one month and was thereafter seen daily at the outpatient burn unit, requiring several readmissions for surgery to graft skin and correct the scarring process.

Appellant Reeves filed this action in February 1984 against respondents Geigy Pharmaceutical, Inc. ("Geigy"), manufacturer of the anticonvulsant carbamazepine, sold under the name Tegretol; Eli Lilly & Co. ("Lilly"), manufacturer of Phenobarbital; and Dr. Moress. Alleging his injuries were caused by these drugs, he sought damages for full thickness skin injuries to more than two-thirds of his body; damage

---

1. No findings of fact were made by the trial court. The preceding facts regarding Reeves's treatment history are taken from those set forth in respondent Moress's memorandum in support of his summary judgment motion. Their purported source, the deposition of Reeves's mother, has inexplicably not been included as part of the record on appeal. There is a confusing indication in Reeves's medical records that he was treated by respondent Moress since December 1978.

to organs, tissues, and muscles; severe, permanent scarring and disfigurement; extreme physical and mental anguish; loss of earnings and earning capacity; and medical expenses in excess of $200,000. His eight causes of action against the three defendants can be summarized as follows: (1) Geigy and Lilly are liable for the release of defective products and/or the negligent design, testing, manufacture, marketing, distribution, labelling, and promotion of the drugs Tegretol and Phenobarbital, and for failure to give adequate warning of their possible side effects; Moress is included in the product liability claim because of his part in the prescription, distribution, and sale of the allegedly defective products; (2) Geigy, Lilly, and Moress breached express and implied warranties and made actionable misrepresentations to Reeves; (3) Geigy, Lilly, and Moress breached warranties of merchantability and fitness for a particular purpose; (4) Moress breached the warranty of fitness for a particular purpose; (5) Moress intentionally failed to warn of the substantial and significant risks of serious harm resulting from the use of Tegretol and/or Phenobarbital, including the injuries actually suffered by Reeves, resulting in a failure to obtain Reeves's informed consent to the drug treatment; (6) Moress negligently failed to inform appellant of the same; (7) Moress negligently treated Reeves by prescribing Tegretol and Phenobarbital, by failing to conduct recommended pretreatment tests, and by failing to monitor the dosage levels; and (8) Geigy and Lilly misbranded the drugs Tegretol and Phenobarbital in violation of federal law.

After respondents filed their answers, appellant commenced discovery, sending interrogatories and requests for production of documents in April 1984. By January 1985, the parties had taken the depositions of Reeves, his mother, Dr. Warden, and Drs. Michael Piepkorn and William Zone, dermatologists at the University Medical Center specializing in skin pathology and immunopathology, respectively. Appellant filed another request for production of documents by respondent Geigy in February 1985.

Respondent Moress filed a motion for summary judgment in April 1986 on the grounds that he had complied with existing standards of care in treating appellant and that Tegretol and Phenobarbital were not the proximate cause of appellant's injuries. He supported his motion with the affidavits of two local physicians. Dr. Leonard Swinyer, a dermatologist, stated his opinion, based on his own medical experience and his review of the histological and clinical findings in appellant's medical records, that T.E.N. was not present in this case. Instead, he opined, Reeves "suffered from a peculiar eruption that looked like T.E.N., but histologically either represented a burn or some other disorder not previously identified in the medical literature." He also concluded that, whatever Reeves's skin disorder was, it was not caused by the medications Moress prescribed. Although the affidavit indicates he is certified by the American Board of Dermatopathology, Dr. Swinyer did not assert any particular expertise in, or experience with, drug reactions, T.E.N., or other blistering skin disorders.[2] In his affidavit, Dr. Thompson stated that the type and dosages of medications prescribed by Moress were appropriate given Reeves's seizure disorder and prior medical history, adding that the laboratory tests suggested in the medical literature for monitoring patients on Tegretol would not have predicted a cutaneous reaction to it. In his opinion, Thompson concluded, Moress complied with the applicable standard of care in his treatment of Reeves.

On April 30, 1986, respondents Geigy and Lilly filed a joint motion for summary judgment, relying on the grounds asserted by respondent Moress and on his supporting affidavits and memorandum. Shortly thereafter, appellant filed a motion to extend time for discovery pursuant to Utah R.Civ.P. 56(f) and to continue the hearing

**2.** Dr. Swinyer's affidavit states that his *curriculum vitae* is attached as an exhibit, but it is not.

date on respondents' summary judgment motions. In support of his motion, appellant submitted the affidavit of his counsel asserting a need for additional time in which to obtain affidavits to oppose those of Drs. Thompson and Swinyer.[3] After a stipulated continuance because of prior court commitments of appellant's counsel, a hearing was held on June 2, 1986. The trial court denied appellant's motion to extend discovery and granted summary judgment to respondents, dismissing appellant's complaint with prejudice on June 18, 1986.

## MOTION TO EXTEND DISCOVERY

■ On appeal, Reeves first asserts that the trial court abused its discretion by not granting him further discovery time prior to ruling on the merits of the summary judgment motions. Rule 56(f) provides that a party opposing summary judgment may file an affidavit stating reasons why he is presently unable to submit evidentiary affidavits in opposition to the moving party's supporting affidavits. Such a request should be liberally treated, unless dilatory or lacking in merit. *Strand v. Associated Students of the University of Utah*, 561 P.2d 191, 194 (Utah 1977). *See Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 840 (Utah App.1987). It is for the trial court, in the exercise of its sound discretion, to determine if the reasons stated in the Rule 56(f) affidavit are adequate. *Cox v. Winters*, 678 P.2d 311, 313 (Utah 1984). In making that determination, the trial court considers whether the party against whom summary judgment is sought seeks additional discovery time to uncover purely speculative facts after substantial discovery has already been conducted; whether the other party has appropriately responded to discovery requests; and whether sufficient time has already passed since the inception of the lawsuit for use of discovery procedures. *Downtown Athletic Club v. Horman*, 740 P.2d 275, 278 (Utah App.1987). If the court finds the reasons stated in the Rule 56(f) affidavit adequate, it may, among other things, continue the

summary judgment motion and provide additional time to submit opposing affidavits. *Id.*

Applying these principles, we hold that the trial court did not abuse its discretion in denying appellant's Rule 56(f) request. The affidavit of Reeves's counsel contains only one assertion pertinent to the request for continuance, i.e., she had not had adequate time to conduct sufficient discovery and secure expert affidavits opposing those of respondents. Although two other paragraphs outline counsel's eight-day federal trial commitment commencing May 12, 1986, no explanation—except the insufficiently vague one of "prior and present litigation commitments"—was given for her inability to obtain opposing affidavits during the lengthy period from the summer of 1985 through April 1986, after completion of the depositions and receipt of responses to interrogatories and requests for documents. Although this appears to be a complex case, counsel made no mention of any particular problems or difficulties encountered to support her request for more discovery time. Counsel also did not articulate what type of additional discovery was needed or the time necessary to complete it.

Thus, the trial court reasonably determined the reasons stated in appellant's cursory Rule 56(f) affidavit were inadequate to justify further delay in ruling on the summary judgment motions.

## MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) authorizes the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering a motion for summary judgment, it is not appropriate for a court to weigh the evidence or assess credibility; the sole initial inquiry is

---

3. The record before us indicates Reeves made no effort to strike or otherwise challenge respondents' supporting affidavits, thereby waiv-

ing any evidentiary objections to them. *See Franklin Fin. v. New Empire Dev. Co.*, 659 P.2d 1040, 1044 (Utah 1983).

whether there is a genuine issue of material fact. *W.M. Barnes Co. v. Sohio Natural Resources Co.,* 627 P.2d 56, 59 (Utah 1981). Furthermore, it only takes one sworn statement to dispute the averments on the other side of the controversy and create such an issue. *Id.; Lucky Seven Rodeo Corp. v. Clark,* 755 P.2d 750, 752 (Utah App.1988).

Because disposition of a case on summary judgment denies the benefit of a trial on the merits, this court must review the facts and reasonable inferences therefrom in the light most favorable to the losing party. *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987). If, after doing so, we conclude there is a dispute as to a material issue of fact, we must reverse the trial court's determination and remand for trial on that issue. *Id.; Hardy v. Prudential Ins. Co.,* 763 P.2d 761 (Ct.App.1988).

■■■ The factual element underlying all appellant's pleaded theories of liability is that his severe skin injuries were caused by the drugs Phenobarbital and/or Tegretol. In order to prevail on his negligent medical treatment claim, Reeves also had to establish the standard of care applicable to Moress and the doctor's breach of that standard. *See Robinson v. Intermountain Health Care, Inc.,* 740 P.2d 262, 264 (Utah App.1987). Because these matters are outside the knowledge and experience of laypeople, expert medical testimony was required to establish causation, the standard of care, and its breach. *Hoopiiaina v. Intermountain Health Care,* 740 P.2d 270, 271 (Utah App.1987).

Respondents' motions for summary judgment were based on the asserted lack of such causation, attested to in Dr. Swinyer's brief and conclusory affidavit, and Moress's adherence to the applicable standard of care in his treatment of Reeves, attested to by Dr. Thompson.

■■■ Appellant contends that, even without opposing affidavits, the record before the trial court demonstrated a genuine issue of disputed material fact to be resolved by the factfinder, namely, whether his injuries were caused by the drugs.[4] We agree.

In their supporting memorandum, respondents misleadingly declared that Reeves's allegation of a causative link between his skin disorder and Tegretol and Phenobarbital was "unsupported by all the medical testimony in this case," directing the trial court to a few pages in the depositions of Drs. Warden, Zone, and Peipkorn, which were published at respondents' request. They then represented to the trial court that Dr. Warden, the burn specialist who treated Reeves on admission and saw him daily as an inpatient and regularly thereafter, had asserted in an affidavit that "he does not believe the drugs in question were causally connected with Reeves' [sic] injury." If such an affidavit ever existed, it is not in the record before us, and no further reference has been made to it.

Dr. Warden initially concluded after Reeves's admission to the burn unit that he was suffering from T.E.N. and treated him based on that diagnosis. In his November 1981 discharge summary, he listed Reeves's condition as T.E.N., secondary to allergic response to Tegretol or Phenobarbital. At his August 1984 deposition,

**4.** Appellant filed no written memorandum in the trial court opposing summary judgment on the merits. However, appellant's counsel affirmatively represented to this court at oral argument that the existence of a dispute in the record on the causation issue was argued to the trial court. In reply, respondents' counsel did not deny this, but stressed that the hearing before the trial court "focused" on the Rule 56(f) continuance request. The trial court's unsigned minute entry of June 2, 1986 indicates the court heard argument from Reeves opposing summary judgment on the merits. Furthermore, the issue was raised and argued in his initial and reply briefs, with counsel stating appellant had argued before the trial court that "the evidence offered by respondents in support of their Motions for Summary Judgment did not entitle respondents to be granted summary judgment against appellant Larry Reeves." Brief of Appellant at 8. *Cf. Busch Corp. v. State Farm Fire & Casualty, Co.,* 743 P.2d 1217, 1219 (Utah 1987) (nothing in record or plaintiffs' briefs to support the possibility that they argued in opposition to summary judgment at the trial court's hearing on the motion). We, therefore, reject respondents' suggestion that the issue is being raised for the first time on appeal.

Warden detailed the clinical and histological reasons for rejecting the possibility of a thermal burn and adhering to his original diagnosis. He also explained there are multiple, often confusing, terms for this syndrome [5] in the medical literature:

It has been associated with erythemia multiforma [sic] which is a broad category, and it has also been called Stevens–Johnson syndrome. Probably a better way of looking at it is there's generally two classes: One is a Stevens–Johnson syndrome which includes toxic epidermal necrolysis, and there is a skin syndrome which is due to staphylococcus organisms. There are those two major categories, but it's a disease of unknown etiology.

Although Warden made clear that the medical profession has not yet determined the exact cause or causes of T.E.N., he also stated it had been linked to prescription medications. Explaining why he had twice replaced Reeves's blood with fresh frozen plasma in light of the progressive skin injury and loss after the first day of hospitalization, Warden stated:

A. Although we don't know the exact etiology of toxic epidermal necrolysis, most investigators feel it is an autoimmune type disease, in that some etiological agent sets up an antigen-antibody response, and that antibody response attacks the patient instead of what it was supposed to attack; very similar to what we see with a—penicillin-type allergies although it's a little different....

Q. So removal of the plasma would remove the antibodies?

A. Correct.

Warden testified Reeves's skin blistering and loss progressed no further after the second serum replacement, consistent with his antibody theory. Asked why he had requested a consultation on Reeves's case with Dr. Matsuo, a neurologist at the University Medical Center, Warden responded:

[B]ecause the patient was on seizure medication and they have been described

to be an association with this disease, then we needed consultation from neurology to alter his medication for his seizure disorder. We did not want to continue him on with the same medication.

Dr. Matsuo's written consultation report dated November 7, 1981, which is attached along with all Reeves's medical records as an exhibit to Warden's deposition, noted that the skin biopsy results were consistent with T.E.N., which "has been reported in association with chronic anticonvulsant medications (Annals of Neurology, vol. 5, 262 (1979)). Therefore, his anticonvulsants were stopped and he was placed on Dilantin."

Dr. Warden also testified concerning his April 5, 1982 letter report to the Department of Health and Human Services, a document included in Reeves's medical records. In it, he described Reeves as having experienced toxic epidermolysis, secondary to an allergic reaction of the Stevens–Johnson variety, adding that the etiology of this syndrome "is probably due to Tegratol [sic] or Phenobarbital."

Dr. Zone, a consulting dermatologist who saw Reeves twice, testified at his deposition that he initially agreed T.E.N. was the most likely diagnosis, given the patient's medications, because T.E.N. "has occurred with virtually any drug...." At another point, he described T.E.N. as manifesting itself after a history of either a viral illness, some type of new drug exposure, or repeat drug exposure after a stoppage and restart. Zone, whose specialty area within dermatology is immunopathology, also stated there is no laboratory test to prove or disprove on an immunological basis whether a patient has suffered a drug reaction. Likewise, he testified, the only way to determine whether a particular drug had caused T.E.N. in a particular patient was to rechallenge, i.e., give that person the suspected drug again and watch the potentially fatal result. It is true Zone testified Reeves's subsequent scarring pattern, histological examination results, and long his-

---

**5.** Toxic epidermal necrolysis is also called "Lyell's syndrome." *Webster's Medical Desk Dic-* *tionary* 723 (1986).

tory on anticonvulsants did not fit the classic pattern of T.E.N. patients, causing him to waver away from T.E.N. as the proper diagnosis of Reeves's condition. But his testimony nonetheless provides evidentiary support for a causative link between Reeves's medications and T.E.N., the diagnosis adhered to by Reeves's treating physician. Zone's deposition testimony also calls into serious question, given the present state of medical knowledge, the credibility of any medical opinion about Reeves's condition definitively ruling out T.E.N. and declaring his medications not to be the cause of his skin disorder.

Finally, the record before the trial court also contained appellant's February 1, 1985 request to Geigy for production of documents related to "every adverse reaction case report referred to in the document attached hereto as Exhibit 1, previously furnished by you in Ciba–Geigy Corporation's Answers to Plaintiff's First Set of Interrogatories, dated May 25, 1984." That exhibit, apparently first compiled in 1980 and updated in March 1984, lists 145 reports of varying types and severities of skin eruptions and rashes as reactions to Tegretol, going back as far as 1972 and including nine reports of erythema multiforme, eleven reports of Stevens–Johnson syndrome, and one of Lyell's syndrome.

Viewing this evidence and reasonable inferences to be drawn from it in the light most favorable to appellant, we hold that there was sufficient material in the record before the trial court to controvert Dr. Swinyer's expert opinion and demonstrate a genuine factual dispute over whether the drugs Tegretol and/or Phenobarbital caused Reeves's skin injuries. Accordingly, summary judgment was inappropriately entered in favor of respondents on all appellant's causes of action, with the exception of the seventh, his medical malpractice claim against Moress.

Appellant has not pointed to any sworn evidentiary material in the record controverting Dr. Thompson's expert opinion that Moress's *treatment* of Reeves, including his choice of medications and prescribed dosages, complied with the applicable standard of care. Appellant therefore demonstrated no dispute regarding either the standard of care or its breach, elements essential to his negligent medical treatment claim in addition to the element of causation. *See Robinson,* 740 P.2d at 264; *Martin v. Mott,* 744 P.2d 337 (Utah App.1987). The dispute we have found in the evidence as to causation was thus no bar to entry of summary judgment based on Thompson's unrefuted, sworn assertion of no negligent treatment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986) (on motion for summary judgment, non-moving party's failure of proof concerning one essential element of that party's case necessarily renders all other facts immaterial). In other words, even if the drugs did cause appellant's injuries, the Thompson affidavit conclusively established that Moress's treatment of Reeves was, nonetheless, in full compliance with the applicable standard of care.[6] Accordingly, respondent Moress was entitled to summary judgment as a matter of law on appellant's seventh cause of action.

The judgment of the trial court is affirmed only insofar as it dismisses with prejudice appellant's seventh cause of action. The judgment is otherwise reversed and the case remanded for further proceedings. The parties are to bear their own costs on appeal.

GARFF and BENCH, JJ., concur.

---

**6.** On the other hand, there is nothing in Dr. Thompson's affidavit or the deposition testimony cited by respondents about the lack of any of the elements essential to Reeves's causes of action against Moress based on a lack of informed consent to treatment with Tegretol and Phenobarbital. *See* Utah Code Ann. § 78–14–5 (1987).

The allegations in appellant's complaint on these claims, paragraphs 31–41, thus remain uncontradicted by sworn evidentiary material in the record, precluding summary judgment in respondent Moress's favor on appellant's fifth and sixth causes of action.