**REDEVELOPMENT AGENCY OF SALT LAKE CITY, a public entity, Plaintiff,**

v.

**Ellen K. DASKALAS, an individual, d/b/a The Pawn Shop, a Utah corporation; and Terry Pantelakis, an individual, d/b/a AAA Jewelers & Loans, Defendants and Appellants,**

**and**

**Juanita Irene Burge; Robert D. Barrows, Jr.; Beatrice Irene Barrows, et al., Defendants and Respondents.**

**REDEVELOPMENT AGENCY OF SALT LAKE CITY, a public entity, Plaintiff and Respondent,**

v.

**Juanita Irene BURGE; Robert D. Barrows, Jr.; Beatrice Irene Barrows; Ellen K. Daskalas, an individual d/b/a The Pawn Shop; The Pawn Shop, a Utah corporation; James Anderson, an individual d/b/a Jim's Ribs; Terry Pantelakis, an individual, d/b/a AAA**

Jewelers; and Loans and Sales, Inc., a Utah corporation, Defendants and Appellants.

Nos. 880302–CA, 880292–CA.

Court of Appeals of Utah.

Oct. 11, 1989.

Rehearing Denied Jan. 8, 1990.

Brant H. Wall and Jerome H. Mooney, III, Salt Lake City, for appellants, Daskalas, The Pawn Shop, and Pantelakis.

John T. Evans, Salt Lake City, for appellants and respondents, Burge, Barrows and Barrows.

Harold A. Hintze, Provo, for respondent, Redevelopment Agency of Salt Lake City.

Before BILLINGS, GARFF and GREENWOOD, JJ.

## OPINION

GARFF, Judge:

This consolidated case arises out of the attempt of plaintiff Redevelopment Agency of Salt Lake City (RDA) to condemn property located on Block 57 owned by defendants Burge, Barrows, and Barrows (Owners) and leased by defendants Daskalas and Pantelakis (Tenants). In Case No. 880302–CA, Owners appeal the trial court's denial of (1) payment to them of interest on funds deposited by RDA with the court, and (2) expert witness fees and trial costs. In Case No. 870236–CA, Tenants appeal the trial court's determinations (1) that Tenants had no compensable leasehold interest at the time of the condemnation, and (2) that Tenants are liable for Owners' attorney fees under their lease agreements. We affirm in part, but remand for determination of the amount of attorney fees.

About August 1, 1981, Tenants leased premises on Block 57 from Owners under separate but identical written lease agreements. These agreements granted Tenants five-year leases with options to renew for another five years, and contained "condemnation clauses" which provided, in the event the property was condemned, that the leases were terminable at will by either party. The agreements also provided that Owners would receive attorney fees if they were required to enforce the lease provisions.

In connection with its role in redeveloping portions of downtown Salt Lake City in 1984, RDA chose Lincoln Property Company (Lincoln) to redevelop Block 57. By 1985, RDA had acquired some property on the block, but not enough for Lincoln to begin construction of the redevelopment project. Seven landowners filed suit, separate from this action, contesting their inclusion within the redevelopment area. The trial court, in the separate action, ruled that RDA did not have authority to condemn the property. This ruling created a serious impediment to Lincoln's ability to develop Block 57, and gave the landowners who contested RDA's condemnation authority considerable negotiating advantage. Lincoln became increasingly discouraged with its ability to put together a sufficiently large redevelopment site and indicated to RDA that it would continue with the project only if it could be assured of acquiring the entire northern one-third of Block 57. Meanwhile, many of the other landowners on Block 57 were desperate to sell their rapidly deteriorating property to Lincoln, and many had signed options to that effect.

On June 21, 1985, RDA initiated the present condemnation action against Owners and Tenants in an effort to insure that Lincoln would have the property necessary to begin development. RDA initially offered defendants $273,000.00 for the prop-

erty, which it stated was the property's fair market value.

RDA filed a motion for an order of immediate occupancy of the premises on August 1, 1985. In response, Tenants' counsel executed a stipulation consenting to RDA's occupancy of the premises, based upon an agreement that Tenants could lease the property back from RDA. Owners, however, filed an answer objecting to the granting of the order of immediate occupancy, alleging that RDA did not have the power of eminent domain nor the need for immediate occupancy. Owners also claimed that Tenants had no right to any award of compensation from RDA. Tenants filed an answer, putting at issue the question of damages only.

RDA's and Owners' motions were noticed up for hearing on August 13, 1985. Tenants failed to appear at this hearing. Nevertheless, RDA, Owners, and the neighboring landowners, who were anxious to sell their property, stipulated to the entry of an order of immediate occupancy. The court denied Owners' motion for an award of expert witness fees and other trial preparation costs and, despite Tenants' absence, incorporated into its order the provisions of Owners' motion which stated that Tenants had no right or claim to compensation.

The stipulation giving RDA immediate occupancy, entered by the court on August 16, 1985, was contingent upon the following requirements:

First, RDA was to deposit one hundred percent of the property's appraised value, $275,220.00, with the court. This money was to be invested at the rate of eleven and one-half percent per annum while held by the court. Owners could withdraw any portion of the deposited funds, plus interest, at any time, but such a withdrawal would constitute a waiver of any and all defenses they might have as to RDA's ability to condemn the property.

Second, RDA was to submit to Lincoln an agreement for distribution of land for private development (ADL), which was to be signed by both RDA and Lincoln within thirty days. Within thirty days of the sign-

ing of the ADL, RDA was to pay to Owners additional compensation of $76,450.00 from funds that would otherwise have been paid to neighboring landowners. Even if these events did not occur, the order would become effective if Owners withdrew any of the funds deposited with the court, and Owners would be required to immediately relinquish possession of the property.

Tenants filed their answer on August 22, 1985, claiming an interest in the deposited funds. On August 23, 1985, Tenants' counsel objected to the portion of the August 16 order denying Tenants compensation, alleging that he had not been properly notified of the August 13, 1985 hearing. Owners answered Tenants' objection, stating that they had hand-carried notice of their motion to Tenants' attorney's new office at least five days prior to the hearing and, even if Tenants had appeared, that they would have had no right to participate in the condemnation proceeds. Tenants' objection was noticed up for hearing on October 11, and then was continued to November 1, 1985. The court never ruled on Tenants' objection.

Meanwhile, on October 11, 1985, RDA filed a certificate of readiness for trial. On October 25, 1985, Owners filed a motion for summary judgment, asserting that Tenants were not entitled to share in any condemnation award. Tenants opposed this motion, arguing that they were entitled to the capitalized value of their lease, known as "bonus value." The court heard Tenants' motion on November 1, 1985, but continued Owners' motion for summary judgment and, at Tenants' request, froze the funds deposited by RDA with the court until Tenants' rights were determined.

Lincoln and RDA did not sign the ADL as provided for in the August 16 stipulation, so the conditions set forth in the stipulation never came about and the order of immediate occupancy, dependent upon the conditions, never became effective.

On February 10, 1987, the court heard the issues between Owners and Tenants and granted Owners' motion for summary judgment, ruling, as a matter of law, that Tenants did not have any compensable in-

terest aside from the value of any improvements they might have made on the property. The court also ordered that Tenants pay Owners' attorney fees pursuant to the lease agreements.

The issue of the fair market value of the property was litigated in a jury trial which began on February 23, 1987. RDA had offered Owners $275,220.00 for the property, but Owners asserted that the property was worth $660,000.00. The jury found that the property was worth $305,800.00. Tenants did not appear and did not proffer any evidence as to the value of any improvements they might have made to the property.

On March 15, 1987, Owners moved: (1) for a new trial on the issue of just compensation; (2) for the court to lift the freeze on the money deposited with the court; and (3) for the court to order that the money, including accrued interest, be paid to Owners. The court denied this motion and ordered that the funds be returned to RDA. Consequently, Owners never withdrew any of the funds deposited with the court pursuant to the August 16, 1985 stipulation.

At this time, Tenants were still occupying the premises and making rent payments to Owners under the terms of the lease agreements. The court ordered Tenants to continue paying rent to Owners until RDA obtained possession of the property.

On March 18, 1987, at the trial court's request, Owners submitted an affidavit setting forth their attorney fees incurred in defending against Tenants' claims. This affidavit indicated that Owners' attorney spent 133 hours at $100.00 per hour, for a total of $13,300.00, and itemized additional costs and expenses of $2,130.00. Tenants filed an objection to the proposed findings of fact, conclusions of law, order, judgment, and affidavit.

On March 25, 1987, a hearing was held to determine the amount of attorney fees that should be awarded to Owners. RDA proffered evidence explaining its need for immediate occupancy of the property because there was still a question as to whether RDA had the power to condemn Block 57.

Owners moved to include as costs $18,402.67 of fees allegedly paid to five expert witnesses, three of whom had been called to testify at trial, and for an award of the interest on the funds deposited by RDA pursuant to the order of immediate occupancy. The trial court ordered RDA to pay Owners' court costs and attorney fees incurred in establishing the fair market value of the property, affirmed its order that Tenants were to pay Owners' attorney fees incurred in defending the action against Tenants, and found that Owners were entitled to rent payments until the property was turned over to RDA. It denied Owners' requests for payment of the interest accrued on the money filed by RDA with the court pursuant to the August 16, 1985 stipulation, and payment by RDA of Owners' expert witness fees and associated expenses.

Owners then submitted supplemental affidavits supporting their request for attorney fees and costs. Tenants filed an opposing affidavit, alleging that attorney fees for enforcement of the lease provisions should not have exceeded $1,000.00.

On May 28, 1987, the court entered its conclusions of law, but did not make any factual findings. It ordered that RDA pay Owners $305,800.00 plus a reasonable attorney fee of $10,933.00 with interest, and costs of $332.70. It found that Tenants were not entitled to any compensation for their leasehold interests but ordered that they could present evidence at trial of any improvements made to the property for which they could be compensated. It also ordered that Tenants pay Owners $9,000.00 for attorney fees.

On May 28, 1987, the trial court denied Owners' motion for a new trial, ordered Tenants to continue to pay rent to Owners until RDA took possession of the property, and awarded title to the property to RDA upon its payment of $305,800.00 plus interest and attorney fees to Owners.

On June 5, 1987, Owners acknowledged that RDA had paid them $305,800.00 plus $10,933.00 in attorney fees, $833.05 in interest, and $332.70 in costs. That same day, the court entered the final order of

condemnation and RDA obtained possession of the property.

Both Owners and Tenants appeal the trial court's judgment, raising the following issues:

(1) Is RDA required to pay to Owners interest on deposited funds pursuant to paragraphs 1(a)[1] and 1(d)[2] of the stipulation?

(2) Did the trial court err in ruling that RDA's filing of the condemnation action terminated Tenants' leasehold interests, thus depriving Tenants of the right to a full evidentiary hearing on the issue of damages?

(3) Are Owners entitled to reimbursement by RDA for expert witness fees and other trial preparation expenses?

(4) Under the terms of Tenants' lease agreements, should Owners be awarded attorney fees for defending against Tenants' damage claims, or did this right end if and when the filing of the condemnation action terminated Tenants' leasehold interests? If Owners were properly awarded attorney fees against Tenants, was the award reasonable and proper under the pleadings and circumstances, and adequately supported by the record?

(5) Are Owners entitled to reimbursement by RDA of costs and attorney fees on appeal?

(6) Are Owners entitled to reimbursement by Tenants for attorney fees on appeal because Tenants' appeal is frivolous?

## I.   INTEREST ON FUNDS DEPOSITED WITH COURT

Owners claim that the trial court erred in denying their request for accrued interest on the funds deposited by RDA pursuant to the stipulation. They assert, instead, that this document is a sixty-day option contract with the interest constituting consideration. RDA, on the other hand, interprets the document as an order of immediate occupancy and argues that Owners have no claim to the interest because RDA never received occupancy under the stipulation.

The document at issue is an agreement, stipulated to by the parties, which was read in open court, adopted by the court, and entered on August 16, 1985. It conditioned the granting of RDA's motion for an order of immediate occupancy upon the occurrence of the following conditions: (1) payment by RDA to the court clerk of one hundred percent of the assessed value of the property, $275,220.00; and (2) either (a) execution by RDA of a property distribution agreement (ADL) with Lincoln within thirty days, and then, within another thirty

---

1.  Section 1(a) reads as follows:

Plaintiff shall pay into the Clerk of the Court upon signing of this Order of Immediate Occupancy the sum of $275,220.00, being 100% of the appraised value of the subject property based upon a written appraisal obtained by plaintiff. While retained by the Clerk of the Court, said funds shall be invested by the Clerk at the highest interest available for federally insured accounts. The plaintiff, however, agrees and warrants that said funds will earn interest at an effective rate of 11.5 annual percentage rate for the term of which they are held by the Clerk of the Court, not to exceed a period of three years from the date of the Order of Immediate Occupancy and that any shortfall or difference between the actual interest earned by virtue of the Clerk's investment and the 11.5 annual percentage rate shall be paid by plaintiff to the defendants Burge, Barrows and Barrows upon demand as herein provided. While said funds are on deposit with the Clerk of the Court, all or any part of said funds may be withdrawn

hereafter at the option of defendants Burge, Barrows and Barrows, or any of them, upon a written demand of Burge, Barrows and Barrows or their counsel of record. The withdrawal of all or any part of said deposited funds by defendants Burge, Barrows and Barrows shall constitute a waiver of any and all defenses to the taking by condemnation of the subject property as provided in Section 78–34–9, Utah Code Ann., 1953, as amended, except the issue of just compensation which shall then be the sole issue reserved for trial.

2.  Section 1(d) of the contract states that:

This Order of Occupancy shall not be effective unless or until, (1) the ADL is signed by Lincoln Property and the Redevelopment Agency within thirty (30) days from date hereof, and the sum of $76,450.00 above provided has been paid pursuant to the terms and provisions herein, or (2) the defendant landowners have withdrawn all or part of the $275,220.00 deposited with the Clerk of the Court as herein provided.

days, payment to Owners of $76,540.00 additional compensation funded by neighboring landowners; or (b) withdrawal by Owners of any or all of the funds deposited by RDA with the court clerk. Owners' withdrawal of any of the deposited funds would result in their waiver of "any and all defenses to the taking by condemnation of the subject property ... except the issue of just compensation which shall then be the sole issue reserved for trial."

In determining whether the August 16, 1985 stipulation is an order of immediate occupancy or an option contract, we apply the rules of contract interpretation. We look at the contract in its entirety, in accordance with its purpose, giving effect to all of its parts insofar as is possible. *Larrabee v. Royal Dairy Prods. Co.*, 614 P.2d 160, 162–63 (Utah 1980). To the extent that the interpretation of the contract is a question of law, we need not defer to the trial court's conclusions. *Jones v. Hinkle*, 611 P.2d 733, 735 (Utah 1980). If the document, itself, is ambiguous, then parol evidence may be used in arriving at an interpretation. *Power Sys. and Controls, Inc. v. Keith's Elec. Constr. Co.*, 765 P.2d 5, 9–10 (Utah Ct.App.1988). In evaluating parol evidence, however, we defer to the trial court's factual findings because of its advantaged position in ascertaining the credibility of witnesses. *See Fashion Place Inv., Ltd. v. Salt Lake County*, 776 P.2d 941, 943 (Utah Ct.App.1989). We note that

> [i]t is a fundamental rule that in the construction of contracts the courts may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made. To ascertain that intention, regard must be had to the nature of the instrument itself, the condition of the parties executing it, and the objects which they had in view.

*Kintner v. Harr*, 146 Mont. 461, 408 P.2d 487, 494 (1965) (citations omitted); *see also Berman v. Berman*, 749 P.2d 1271, 1273 (Utah Ct.App.1988).

Thus, to assist in interpreting the language of the contract, we examine the circumstances surrounding the entry of the document and the purposes behind its execution. At the time of the hearing, Lincoln was attempting to develop at least the northern third of Block 57, but could not proceed unless it had access to a sufficiently large piece of property. RDA had filed condemnation actions against all Block 57 property owners, but had not obtained occupancy of much of the property. Five property owners located on the southern two-thirds of the block and Owners had filed lawsuits contesting RDA's condemnation power. RDA had filed an interlocutory appeal contesting an adverse ruling in its lawsuit against the other five property owners. At the time of this hearing, that appeal and its associated lawsuit were still pending, making it uncertain whether RDA did, in fact, have the power to condemn property on Block 57.

Lincoln's commitment to develop Block 57 was contingent upon its execution, with RDA, of the ADL. Lincoln would not sign the ADL unless it was certain that RDA could immediately obtain occupancy of at least the northern third of Block 57. Because of the uncertainty surrounding RDA's condemnation authority, Lincoln was rapidly losing interest in pursuing the project at all. Thus, time was of the essence. Additionally, other adjoining landowners were eager to sell their property to RDA as soon as possible because of the rapidly declining property values on Block 57. Consequently, they were willing to pay Owners some of the compensation they would have otherwise received for their property in order to induce Owners to settle with RDA. Thus, the parties' stipulation was entered into as an attempt to facilitate RDA's arrangement with Lincoln.

RDA, pursuant to the August 16, 1985 stipulation, deposited $275,220.00 with the clerk of the court. However, Lincoln subsequently withdrew from the project, so the ADL was never executed. Consequently, the court did not enter an order for immediate occupancy, and RDA never occupied Owners' property pursuant to the stipulation.

An order of immediate occupancy permits the condemning authority to occupy property pending a condemnation action. It is an interlocutory order, entered *pendente lite,* which only authorizes the State to take immediate possession until a final adjudication is held on the merits. *Utah State Road Comm'n v. Friberg,* 687 P.2d 821, 833 (Utah 1984).

To grant an order of immediate occupancy under Utah Code Ann. § 78–34–9 (1987), the court must require, as a condition precedent, that the condemning authority deposit at least seventy-five percent of the appraised value of the property it seeks to condemn with the clerk of the court. The landowner is then free, at any time, to withdraw the money filed with the court clerk. If he does, however, he forfeits his right to challenge the condemning authority's power to condemn his property, and may only dispute the final amount of compensation. This amount may be established pursuant to an evidentiary hearing separate from the granting of the order of immediate occupancy, and includes eight percent per annum interest on the difference between the amount finally awarded and the amount the condemning agency originally deposited with the court clerk. Interest accrues from the earlier date of either the condemning authority's taking possession of the property or the entry of the order of immediate occupancy, until the date of judgment. *Utah County v. Brown,* 672 P.2d 83, 85 (Utah 1983).

The purpose behind the parties' stipulation was to permit RDA to immediately occupy Owners' property pending determination of its condemnation authority and the value of the property. Like an order of immediate occupancy, the stipulation did not purport to finally set the amount of compensation Owners should receive.

The court required two conditions precedent to its granting of an order of immediate occupancy under the stipulation. The first condition required RDA to deposit one hundred percent of the appraised value of the property, twenty-five percent more than required for an order of immediate occupancy under section 78–34–9. The first alternative under the second condition, that RDA and Lincoln sign the ADL and then pay Owners additional compensation, is unique to the stipulation and has no counterpart under section 78–34–9. However, the second alternative, like the statute, provides that if Owners were to withdraw the funds, they would forfeit the right to litigate RDA's condemnation authority.

The stipulation required eleven and one-half percent per annum interest to be paid upon the entire appraised value of the property deposited with the court, from the date of the stipulation to the earlier of either the date of final determination of the fair market value of the property or the expiration of three years. Section 78–34–9 only requires that eight percent interest be paid on the balance of the fair market value of the property not deposited with the court from the date of the granting of the order of immediate occupancy or the date of entry on the property, whichever occurs earlier, to the date of final determination of the value of the property. Therefore, the stipulated terms in regard to interest are substantially more favorable to Owners than statutorily required.

In the stipulation, the court set a sixty-day time limit for the conditions precedent to occur. This is consistent with the statute's allowance for the trial court to set reasonable time limits for compliance with its terms.

In summary, the parties' stipulation closely parallels the requirements and purpose for an order of immediate occupancy pursuant to section 78–34–9. It diverges from the statutory requirements only in terms which are substantially more favorable to Owners than required. We conclude that the parties incorporated these terms to induce Owners, who were clearly unwilling otherwise, to enter quickly into the agreement with RDA.

On the other hand, Owners contend that this stipulation is really an option agreement for which the accrued interest was to serve as consideration. This court, relying upon Restatement (Second) of Contracts § 25 (1981), has recently defined an option

contract as a "promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer." *Property Assistance Corp. v. Roberts,* 768 P.2d 976, 978 (Utah Ct.App.1989) (quoting Restatement (Second) of Contracts § 25 (1981)). We have indicated that:

> [t]wo elements exist in such a contract: (1) an offer to sell, which does not become a contract until accepted, and (2) a contract to leave the offer open for a specified time. Thus, by its terms, an option contract for real property requires one offer and acceptance of the exclusive right to purchase the property and another offer and acceptance for the actual transfer of the property.

*Id.* (citations omitted).

Because the stipulation very closely resembles a statutory order of immediate occupancy and not an option contract, we reject Owners' assertion and find that the stipulation should be interpreted as an order of immediate occupancy.

It is undisputed that the first condition occurred when RDA deposited one hundred percent of the appraised value of the property with the court. However, neither alternative of the second condition occurred. RDA and Lincoln never executed the ADL and Owners, during the approximately eighty-five days the funds deposited with the court remained unfrozen, never withdrew any of the funds. This nonoccurrence of the conditions discharged RDA's duty to pay Owners the consideration recited under the stipulation, including interest.

Although this is dispositive of Owners' claim to the accrued interest, we note additionally that under section 78-34-9, where there is no entry or occupation of the property by the condemning agency, there is no entitlement to interest. *See Oregon Short Line R. Co. v. Jones,* 29 Utah 147, 80 P.

732, 735–36 (1905).[3] It is undisputed that RDA never occupied Owners' property pursuant to the stipulation, so Owners are not entitled to interest.

In summary, we conclude that the interest provided for in section 1(a) of the parties' stipulation was consideration for taking possession of the property, not for a sixty-day option agreement, and that the conditions set forth in paragraph 1(d) of the stipulation are conditions precedent to enforcement of the entire agreement, rather than merely to the payment of interest.

## II. BONUS VALUE OF TENANTS' LEASEHOLD INTERESTS

Tenants insist the trial court erred in finding that they were not entitled to any "bonus value"[4] because their "leases terminated as of the commencement of this action against the Defendants." They argue that at the time the action was filed, their leases had approximately thirteen unexpired months, and that they later renewed the leases for additional five-year terms. They maintain that they are entitled to bonus value payments because they would have to pay much more rent elsewhere, and demand a hearing to determine the amount of bonus value to which they are entitled.

Owners assert that Tenants' lease agreements were terminated as of the date of service of RDA's condemnation complaint, and that Tenants' lease provisions do not allow for bonus value payments.

To resolve this issue, we look to the terms of the lease agreements. In doing so, we follow the same rules of contract interpretation as specified in section I. The relevant portions of Tenants' lease agreements read as follows:

> In the event said premises, or any part thereof, or the whole or any part of the

---

**3.** *Oregon Short Line R. Co. v. Jones,* 29 Utah 147, 80 P. 732 (1905) interprets a previous version of the statute, but the operative provisions are sufficiently similar to the present version of the statute for the case to be relevant.

**4.** Bonus value occurs "whenever the capitalized then fair rental value for the remaining term of

the lease, plus the value of any renewal right, exceeds the capitalized value of the rental the lease specifies." *Alamo Land and Cattle Co. v. Arizona,* 424 U.S. 295, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976). *See also Garibaldi v. Oklahoma Indus. Fin. Co.,* 543 P.2d 555, 558 (Okla. 1975).

said building shall be taken by right of eminent domain or shall be taken for any street or public use or the action of public authorities after the execution and before the termination hereof, *this Lease may, at the election of Lessor or Lessee, be terminated;* provided, however, in such event, Lessee shall be entitled to compensation for improvements made to said premises, in an amount equal to the compensation received by Lessor in respect thereof and as a result thereof, regardless of the termination of this Lease.

(Emphasis added.)

By the terms of this lease, either the Lessor or the Lessee may terminate the lease upon the taking of the premises by the right of eminent domain. *See* 51C C.J.S. *Landlord & Tenant* § 98 (1968). "The generally accepted rule is that if the condemning authority takes an estate in fee simple absolute in all of the real property covered by the lease, the lease thereupon terminates." *Beaverton Urban Renewal Agency v. Koning,* 53 Or.App. 842, 632 P.2d 1359, 1360 (1981); *see also Phillips Petroleum Co. v. Bradley,* 205 Kan. 242, 468 P.2d 95, 98 (1970); 51C C.J.S. *Landlord & Tenant* § 98 (1968). Thus, in a total taking, any right which the lessee may have to share in the condemnation award becomes vested at the time of the taking, absent an agreement to the contrary. *Garibaldi v. Oklahoma Indus. Fin. Co.,* 543 P.2d 555, 558 (Okla.1975); *Beaverton Urban Renewal Agency,* 632 P.2d at 1362. The time of the taking is generally considered to be the time at which the condemning authority actually takes possession of the property, not the time at which the initial complaint is served. *See Phillips Petroleum Co.,* 468 P.2d at 99. Therefore, if not previously terminated, Tenants' lease ended on June 7, 1987, the date on which RDA ultimately took possession of the premises. At this time, Tenants' rights to bonus value, if any, became vested.

There is no evidence in the record that either Owners or Tenants terminated the leases on the date RDA initiated its condemnation action. Instead, Tenants continued to occupy the premises and Owners continued to receive rent payments from Tenants. Approximately thirteen months later, on July 31, 1985, the original lease expired. Tenants remained in possession after this time, and continued paying rent at the contract amount to Owners.

Tenants claim that they properly renewed the lease agreements and that, because the second five-year term had not fully elapsed at the time RDA took possession of the premises, they were entitled to the bonus value of the remaining leases. Owners, on the other hand, argue that Tenants never properly extended or renewed the lease agreements and were simply month-to-month tenants who had no bonus value rights.

The renewal provisions of the lease agreements state:

Lessor grants to Lessee an option to renew this Lease for a period of *Five* (5) years after the expiration of the term of this Lease at a rental *to be negotiated at least sixty (60) days prior to the expiration of this Lease,* with all other terms and conditions of the renewal lease to be the same as those herein. *To exercise this option, Lessee must give Lessor written notice of intention to extend at least ninety* (90) days before this lease expires.

(Emphasis added.)

Under the contract, Tenants were required to give Owners written notice of their intent to extend the lease at least ninety days before it expired. Tenants assert that they mailed notifications of their intent to renew the lease to Owners during this period of time. However, they were unable to produce any evidence at trial that they had done so. Owners testified that they never received any such notice. Neither side disputes the facts that Owners never replied to this alleged notification and that a new rental was not negotiated between the parties at least sixty days before the lease terminated. The trial court specifically found that Tenants had not timely notified Owners of their intent to renew the lease. We will not set aside

the trial court's factual findings unless they are clearly erroneous and against the clear weight of the evidence or we otherwise reach a definite and firm conviction that a mistake has been made. Utah R.Civ.P. 52(a); *Reid v. Mutual of Omaha Ins. Co.,* 776 P.2d 896, 899–900 (Utah 1989). "Where evidence is controverted, we assume that the trial judge believed those aspects of the evidence and the inferences reasonably drawn from them that support his decision." *Brixen & Christopher, Architects v. Elton,* 777 P.2d 1039, 1042 (Utah Ct.App.1989); *see also IFG Leasing Co. v. Gordon, Hansen, and Nelson,* 776 P.2d 607, 617 (Utah 1989). After a review of the record, we do not find the trial court's determination that Tenants failed to timely renew the lease to be clearly erroneous.

> The lease agreements further state that: No holding over by Lessee, however long continued, shall operate to renew or extend this Lease without Lessor's written consent. If Lessee holds possession of said premises after the term of this Lease or any renewal term thereof, Lessee shall become a tenant from month to month, at the rent payable in the last installment during the last month of the term of this Lease, and upon the terms herein specified, and shall continue to be such tenant until the tenancy shall be terminated by Lessor or until Lessee shall have given Lessor written notice of at least one (1) month of Lessee's intention to terminate the tenancy.

Under this provision, Tenants' holding over of the property did not create a new lease but resulted only in a month-to-month tenancy which terminated on February 2, 1987, when Owners gave Tenants written notice of their intention to terminate the lease. Tenants' month-to-month tenancy had no bonus value because they were not entitled to the specified rental amount for any more than one month at a time. Therefore, we affirm the trial court in finding that Tenants had no bonus value under their leases, and that, as a consequence, there is no need for an evidentiary hearing to determine the amount of the bonus value.

## III. EXPERT WITNESS FEES AND OTHER TRIAL PREPARATION EXPENSES

Owners appeal the trial court's denial of their request for reimbursement of expert witness fees and other trial preparation expenses. They argue that Utah Code Ann. § 11–19–23.9 (1986), which authorizes reimbursement of a landowner's costs and attorney fees in a condemnation action, also includes reimbursement for expert witness fees and other reasonably necessary trial preparation expenses. This is an issue of first impression in Utah.

Owners argue that they have been deprived of constitutionally required "just compensation" for the taking of their property for public use because they have been required to expend a considerable portion of their award, which was founded on the fair market value of their property, for the services of expert witnesses and other reasonably necessary litigation expenses. They rely on the Florida Supreme Court's opinion in *Dade County v. Brigham,* 47 So.2d 602 (Fla.1950) to support this point:

> We might, and do, add thereto the thought that Section 73.16, Florida Statutes 1941, F.S.A., which provides "All costs of proceedings shall be paid by the petitioner, including a reasonable attorney's fee ..." should be construed in the light of Section 12 of our Declaration of Rights, F.S.A., which declares that private property shall not be taken "without *just* compensation." (Italics supplied.) When so construed the language "All costs of proceedings ..." must be held, in a proper case, to include fees of expert witnesses for the defendants....
>
> Since the owner of private property sought to be condemned is forced into court by one to whom he owes no obligation, it cannot be said that he has received "just compensation" for his property if he is compelled to pay out of his own pocket the expenses of establishing the fair value of the property, which expenses in some cases could conceivably exceed such value.

*Dade County,* 47 So.2d at 604–05.

■ Although the logic of the Florida court's interpretation of "just compensa-

tion" under Florida constitutional provisions appeals to a sense of fairness, it is well settled that "just compensation" under the federal constitution is not so inclusive. Under the federal constitution, "[j]ust compensation 'is for the property and not to the owner.' As a result, indirect costs to the property owner caused by the taking of his land are generally not part of the just compensation to which he is constitutionally entitled." *United States v. Bodcaw Co.*, 440 U.S. 202, 203, 99 S.Ct. 1066, 1066–67, 59 L.Ed.2d 257 (1979) (quoting *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893)). Therefore, attorney fees and other necessary expenses, including expert witness fees, are non-compensable as "just compensation." *9.88 Acres of Land v. State ex. rel. Highway Dep't*, 274 A.2d 139, 140–41 (Del.1971); *see also County of Los Angeles v. Ortiz*, 6 Cal.3d 141, 98 Cal.Rptr. 454, 490 P.2d 1142, 1147 (1971); *State v. Davis*, 53 Haw. 582, 499 P.2d 663, 667 (1972). Instead, compensation for such costs incurred by a landowner in a condemnation action is a matter of legislative prerogative and must be provided for by statute.[7] *Department of Transp. v. Winston Container Co.*, 45 N.C.App. 638, 263 S.E.2d 830, 831 (1980); *see also Schwartz v. Western Power & Gas Co.*, 208 Kan. 844, 494 P.2d 1113, 1116–17 (1972); *Gaylord v. State ex rel. Dep't of Highways*, 540 P.2d 558, 562 (Okla.1975).

Utah Code Ann. § 11–19–23.9 (1986), which provides for reimbursement of the landowner's expenditures in a condemnation action, states, in part:

> Within the project area an agency may:
>
> ....
>
> (2) acquire real property by eminent domain; but when the power of eminent domain is exercised under the provisions of the chapter and the party whose property is affected contests the matter in

the district court, the court may, in cases where the amount of the award exceeds the amount offered, award in addition to his just compensation, costs, including a reasonable attorney's fee as determined by the court. The court, or jury in cases tried before a jury, may also award a reasonable sum as compensation for the costs and expenses, if any, of relocating the owner whose property is acquired or a party conducting a business on such acquired property.

In the present case, RDA acquired Owners' property by eminent domain. Owners contested the matter in district court, and the amount awarded Owners exceeded the amount initially offered to Owners by RDA. Therefore, under section 11–19–23.-9, the court *may* award to Owners, "in addition to [their] just compensation, costs, including a reasonable attorney's fee as determined by the court." *Id.* We note that the award of costs under this section is permissive and discretionary with the court, *Redevelopment Agency of Roy v. Jones*, 743 P.2d 1233, 1236 (Utah Ct.App. 1987), so Owners are not unquestionably entitled to such an award.

We also note that section 11–19–23.9 does not define the term "costs." Owners, in an attempt to define the term "costs," cite Utah Code Ann. §§ 78–34–16 and 78–34–19 (1986), which provide for full reimbursement of all reasonable and necessary expenses actually incurred by a condemnee. These sections are not helpful because neither is applicable to the present case: Section 78–34–16 refers to a condemnation action which is filed and then abandoned by the condemning agency, while section 78–34–19 applies to a concluded condemnation action in which the condemning authority fails to commence or complete construction on the subject property within a reasonable time. Further, the language

---

**7.** The Florida Supreme Court in *Dade County v. Brigham,* 47 So.2d 602 (Fla.1950), interpreted its state constitutional provision for just compensation far more inclusively than the federal constitutional provision, finding that just compensation essentially includes *all* the landowner's expenses incurred in defending a condemnation action, including expert witness fees. Because

Owners have not specifically invoked our analogous constitutional provisions and have not briefed the issue of the extent of protection afforded to landowners under this provision, we do not address its interpretation in this opinion. *See State v. John,* 770 P.2d 994, 997 (Utah 1989); *State v. Johnson,* 771 P.2d 326, 327–28 (Utah Ct.App.1989).

authorizing the reimbursement in these statutes is far more inclusive than the term "costs." In section 78–34–16, the condemnee is to be reimbursed "in full for all reasonable and necessary expenses actually incurred by condemnee because of the filing of the action by condemner, including attorneys fees," and in section 78–34–19(2), for "all reasonable and necessary expenses actually incurred by the condemnee including attorney fees."

The California court, in construing its condemnation statute, similarly observed that the statute did not specify what items may be included as costs. It then ruled that costs are the same as those recoverable in ordinary civil actions. *People v. Bowman*, 173 Cal.App.2d 416, 343 P.2d 267, 269 (1959). Nevada has approved the same construction in determining what costs are allowed under its condemnation statute. *Andrews v. Kingsbury Gen. Improvement Dist. No. 2*, 84 Nev. 88, 436 P.2d 813, 814–15 (1968). We, likewise, approve the same construction.

Rule 54(d)(1) of the Utah Rules of Civil Procedure does not define "costs." However, the generally accepted definition of "costs" under this rule includes:

> ... those fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment.

> There is a distinction to be understood between the legitimate and taxable "costs" and other "expenses" of litigation which may be ever so necessary, but are not properly taxable as costs. Consistent with that distinction, the courts hold that expert witnesses cannot be awarded extra compensation unless the statute expressly so provides.

*Frampton v. Wilson*, 605 P.2d 771, 774 (Utah 1980) (footnotes omitted). Section 11–19–23.9 authorizes compensation for costs and attorney fees, but does not expressly provide for compensation for expert witnesses. We, therefore, conclude that expert witness fees are not reimbursable "costs." Consequently, the trial court ruled correctly in refusing to award Owners compensation for expert witness fees

incurred in defending this condemnation action. We agree, however, with the Delaware court: "If an adjustment in the law of eminent domain is dictated by fairness in this connection, it is a matter for consideration and action by the [legislature]." *9.88 Acres of Land*, 274 A.2d at 140.

## IV. ATTORNEY FEES

### A. Tenants' Liability For Owners' Attorney Fees

Tenants allege that the trial court erred in requiring them to pay attorney fees incurred by Owners in defending against their claims. They reason that: (1) they are not liable under the lease agreements to pay the attorney fees because Owners deemed the lease void for purposes of determining their entitlement to bonus value and, thus, they cannot deem it to be valid for purposes of assessing attorney fees; and (2) Owners' claim for attorney fees was not raised in the pleadings and Tenants did not consent to amend the pleadings. Owners, however, contend that they are entitled to attorney fees both at the trial level and on appeal for issues raised by Tenants. Owners also demand attorney fees on appeal of its claims against RDA.

### *Tenants' Liability Under The Lease Agreement*

"In Utah, attorney fees are awardable only if authorized by statute or by contract." *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988). If authorized by contract, then attorney fees are allowed only in accordance with the terms of the contract. *Mountain States Broadcasting Co. v. Neale*, 776 P.2d 643, 648 (Utah Ct.App.1989).

The portion of the lease agreements authorizing payment of attorney fees reads as follows:

> Lessee also agrees to pay all costs and attorney's fees and expenses that shall arise from enforcing the terms and provisions of this lease.

Tenants claimed compensation for bonus value based upon their purported renewal of the lease for five years. However, they

failed to comply with the conditions of the lease to effectively exercise their option to renew, and the lease precluded them from receiving bonus value payments. Owners successfully resisted their claim for compensation on the grounds that it was a violation of the "terms and provisions of this lease." Thus, the Owners are contractually entitled to collect attorney fees and expenses incurred in defending against Tenants' claims because they were enforcing the lease terms.

Tenants, relying upon *BLT Investment Co. v. Snow*, 586 P.2d 456, 458 (Utah 1978), argue that a party who deems a contract void for one purpose cannot subsequently rely upon that contract to support another purpose. The circumstances in *BLT Investment*, however, are not applicable to the present case. One of the parties in *BLT Investment* rescinded a contract and then relied upon the same contract to attempt to collect attorney fees from the other party. Here, even though Tenants' five-year lease term had expired, the parties continued to maintain a landlord-tenant relationship on a month-to-month tenancy, as provided for in the original lease, until owners terminated the lease. However, Owners did not rescind the contract or declare it void. Consequently, the parties were entitled to rely upon the contractual terms, including the provision for attorney fees, to determine their respective rights and responsibilities. *See Cobabe v. Crawford*, 780 P.2d 834, 835–36 (Utah Ct.App. 1989).

*Tenants' Liability Under The Pleadings*

Tenants also argue that they are not liable for Owners' attorney fees, pursuant to rule 13(f) of the Utah Rules of Civil Procedure, because Owners did not request attorney fees in their pleadings but only raised them in their motion for summary judgment.[5] At trial, Tenants requested that Owners' affidavits supporting their requested fees not be admitted into evidence. The court denied Tenants' request, admitted both Owners' and Tenants' affidavits regarding attorney fees, and ruled that the pleadings could be amended to include attorney fees.

■ Rule 15(b) of the Utah Rules of Civil Procedure allows pleadings to be amended to conform to the evidence presented and the issues actually litigated by the parties. This rule, in part, states that:

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

Thus, pleadings may be amended even when evidence is objected to at trial on the ground that it raises issues not framed by the pleadings. *See Lloyd's Unlimited v. Nature's Way Mktg., Ltd.*, 753 P.2d 507, 509 (Utah Ct.App.1988). "Although Rule 15 ... tends to favor the granting of leave to amend, the matter remains in the sound discretion of the trial court." *Stratford v. Morgan*, 689 P.2d 360, 365 (Utah 1984) (footnote omitted). Therefore, the trial court was within its discretion in concluding that the pleadings could be amended to include attorney fees,[6] even though not initially raised in the pleadings.

*Amount of Attorney Fee Award at the Trial Level*

■ Tenants argue that the trial court improperly awarded Owners attorney fees because counsel's affidavit, submitted by

---

**5.** Owners did not file a cross-claim for attorney fees in their answer to RDA's condemnation complaint because they filed their answer before Tenants asserted their claim. Tenants were put on notice that Owners were seeking attorney fees from them in Owners' motion for summary judgment.

**6.** The trial court's conclusion of law No. 8 reads:

The presentation of the merits of this action will be subserved by amending the pleadings to raise the issues and to conform to the evidence as to claims by the owners against the tenants, which claims are set forth in the owners' Motion for Summary Judgment and which should become part of the issues made by the pleadings herein by way of owners' cross-claim against the tenants.

Owners, was insufficient to support the award.

The calculation of reasonable attorney fees is within the sound discretion of the trial court and will not be overturned absent a clear showing of abuse of discretion. *Dixie State Bank*, 764 P.2d at 988. However, an award made without adequate supporting evidence constitutes an abuse of discretion and must be overruled. *Id.; Barnes v. Wood*, 750 P.2d 1226, 1233 (Utah Ct.App.1988).

While findings of fact are unnecessary in connection with summary judgment decisions, a summary judgment is improper when material facts are disputed. *See Taylor v. Estate of Taylor*, 770 P.2d 163, 168 (Utah Ct.App.1989). "[W]here attorney fees are awarded to a prevailing party on summary judgment, the undisputed, material facts must establish, as a matter of law, that (1) the party is entitled to the award, and (2) the amount awarded is reasonable." *Id.* at 169.

Here, while summary judgment was appropriate in determining that Owners were entitled to an award of attorney fees, the facts are controverted as to the reasonableness of the award.

Owners' attorney fee affidavits were quite detailed, specifying the work actually performed in connection with the litigation of issues raised by Tenants, and the number of hours required to perform this work. On the basis of these affidavits, Owners requested an award of between $5,000.00 and $13,300.00. However, Tenants' attorney filed an opposing affidavit which alleged that the issues involved were not complex, required little research, and should have taken little time. He stated that Owners should, therefore, be awarded no more than $500.00 to $1000.00 for these fees.

It takes only one competent sworn statement to dispute the averments on the other side of the controversy and create an issue of fact. *Reeves v. Geigy Pharmaceutical, Inc.*, 764 P.2d 636, 640 (Utah Ct.App.1988). We find that Tenants' attorney's affidavit sufficiently disputes Owners' averments of fact to create an issue of fact. *See D & L*

*Supply v. Saurini*, 775 P.2d 420, 421 (Utah 1989) (adverse party must set forth specific facts in an affidavit or otherwise to raise any issue of fact); *Creekview Apartments v. State Farm Ins. Co.*, 771 P.2d 693, 695 (Utah Ct.App.1989) (the party opposing summary judgment must set forth specific facts in an affidavit that would be admissible as evidence).

Because there is a dispute as to a material fact, we reverse the lower court's determination of the amount of attorney fees and remand for trial on that issue. The court should make factual findings to support its award. *Reeves*, 764 P.2d at 640; *Cabrera*, 694 P.2d at 625.

### Attorney Fees On Appeal

■ Owners maintain that they are entitled to attorney fees for defending against Tenants' appeal on the grounds that Tenants' appeal is frivolous. While we agree that Tenants' issues on appeal are wholly without merit, we do not reach the issue of whether or not they are frivolous.

The Utah Supreme Court has determined that

> the contractual obligation to pay attorney's fees incurred in enforcing a contract should include those incurred on appeal....
>
> ... We therefore adopt the rule of law that a provision for payment of attorney's fees in a contract includes attorney fees incurred by the prevailing party on appeal as well as at trial, if the action is brought to enforce the contract....

*Management Servs. v. Development Assocs.*, 617 P.2d 406, 408–09 (Utah 1980) (footnote omitted); *see also Dixon v. Stoddard*, 765 P.2d 879, 881 (Utah 1988); *Weston v. Weston*, 773 P.2d 408, 412 (Utah Ct.App.1989). Because Tenants' issues on appeal all dealt with the interpretation and enforcement of Tenants' lease agreements, Owners are entitled to reimbursement by Tenants of their attorney fees incurred on appeal. *See Cobabe v. Crawford*, 780 P.2d at 836–37. We remand for purposes of

determining the amount of a reasonable attorney fee.

## B. RDA's Liability For Owner's Attorney Fees Incurred On Appeal

Owners argue that because Utah Code Ann. § 11–19–23.9 (1986) authorizes an award of attorney fees to condemnees, RDA should be be ordered to pay Owners' attorney fees necessarily incurred on appeal. Rule 34(a) of the Rules of the Utah Court of Appeals, however, states that. "if a judgment or order is affirmed, costs [including attorneys' fees] shall be taxed against the appellant unless otherwise ordered; if a judgment or order is reversed, costs shall be taxed against the respondent unless otherwise ordered."

Owners appealed the trial court's decision in RDA's favor on two major issues: (1) Owners' entitlement to interest paid into the court clerk's office pursuant to the August 16, 1985 stipulation, and (2) reimbursement for expert witness fees under Utah Code Ann. § 11–19–23.9. We affirm the trial court's judgment on both of these issues. Therefore, Owners are not entitled to attorney fees on appeal.

BILLINGS and GREENWOOD, JJ., concur.