**BEEHIVE BRICK COMPANY,
Plaintiff and Appellant,**

v.

**ROBINSON BRICK COMPANY, a
Colorado Corporation, Defendant
and Respondent.**

No. 870548–CA.

Court of Appeals of Utah.

Sept. 1, 1989.

Stanford Nielson (argued), Salt Lake City, for plaintiff and appellant.

Allan L. Sullivan (argued), Salt Lake City, for defendant and respondent.

Before BENCH, GARFF and JACKSON, JJ.

## OPINION

GARFF, Judge:

Plaintiff and appellant, Beehive Brick, Inc. (Beehive), seeks reversal of the trial court's summary judgment dismissing its breach of contract action against defendant and respondent, Robinson Brick Co. (Robco). Robco requests an order affirming the judgment and granting it and attorney fees incurred in responding to this appeal.

From 1983 to early 1985, in response to rumors that Robco's previous distributor was going out of business, Beehive repeatedly contacted Robco in hopes of becoming the exclusive Salt Lake distributor of its products. On February 20, 1985, Robco's sales manager, Monte Jones, orally granted Beehive a temporary distributorship until he could appoint a permanent Utah distributor. Under this arrangement, Beehive bought goods on account from Robco and then resold them to its Utah customers.

Robco had a policy of having only one distributor in a given geographical area. Jones told Beehive that Robco was consid-ering one of Beehive's competitors, Interstate Brick (Interstate), as a distributor, and that Beehive was at a disadvantage in becoming the permanent Utah distributor because of Robco's previous bad experience with smaller firms like Beehive. Beehive representatives, however, stated that Jones told them that Beehive's temporary distributorship would become permanent if it outperformed Interstate Brick in promoting Robco products. Beehive claims that on several occasions Jones congratulated Beehive, noting it was substantially outperforming Interstate Brick in promoting Robco products.

From April to July of 1985, Robco sold bricks on account to Beehive in response to Beehive's written purchase orders. On July 15, 1985, Jones notified Beehive by telephone that Robco had terminated Beehive's distributorship and had appointed Interstate Brick to be its exclusive Utah distributor. To allow Beehive a transition period, Jones allowed Beehive to continue placing new orders until October 15, 1985. Robco confirmed this decision in a letter to Beehive, dated July 22, 1985.

On October 14, 1985, Beehive's sales manager, Dee Young, placed a telephone order with Robco for one million bricks on behalf of his customer, Emerson Larkin. These bricks were to be delivered over a period of twelve to fourteen months, and were to be specially manufactured because Larkin wanted a particular color and texture which Robco had previously manufactured but did not currently carry in stock. Beehive representatives claim that they subsequently sent Robco a written purchase order for the million bricks, which Robco denies receiving.

Jones testified that a distributor would normally place an order of this size over the telephone, but the fact that a distributor had called in such an order did not necessarily mean that Robco had accepted the order. He stated that an agreement was never reached as to whether Robco could fill the million brick order.

In the fall of 1985, Young and Larkin visited Robco's plant for the purpose of

discussing the special manufacture of the million brick order. Young testified that Robco personnel indicated they could produce the special color of brick. He noted that Larkin was very impressed with another of Robco's products, its Dover Gray brick, and stated that Larkin would have accepted Dover Gray if the special color he requested could not be manufactured.

Between October 1985 and February 1986, Robco attempted to manufacture the special color of brick three times. In all, Robco filled approximately one quarter of the million brick order with these test batches. Young asserted that Larkin accepted and used both the 50,000 brick first batch and the 150,000 brick second batch in their entirety. Jones, on the other hand, asserted that Larkin rejected all the test batches because he was disappointed in the color. He indicated that Robco had agreed to try again after the first batch. After the second batch, Robco explained to Beehive that it would be unable to produce the special color because manufacture required use of radioactive materials which were not available. Nevertheless, Robco tried a third time. Jones then stated that Larkin rejected the 200,000 brick third batch because the color was "bland." However, Beehive was able to sell 26,000 bricks from that batch on consignment.

Beehive representatives testified that between March 30 and April 15, 1986, Jones encouraged Beehive to get ready to start placing orders because he would probably be able to give Beehive a split distributorship. Browning, president of Beehive, stated that, at the time Beehive's distributorship had been phased out, Jones had told him "if we continued to perform there might be a possibility of a split distributorship." In February, Jones told him that management had given him authority to give Beehive a split distributorship, and in March, Jones told him that he was going to visit Interstate and tell them they would have to share the distributorship with Beehive. Young testified that Jones, at the end of March, encouraged him to "quietly get orders ready to go so that we could kind of be hitting on all eight cylinders when we were back in with them." Beehive did not receive any written confirmation of this new split distributorship, but got at least two orders in anticipation of it, which Robco ultimately refused to fill.

On April 15, 1986, Jones visited Interstate and Beehive. On this visit, Jones awarded an exclusive distributorship to Interstate and terminated Robco's relationship with Beehive. Jones's account of this meeting is as follows: He told Beehive that he could not justify "cancelling out Interstate" or awarding it only a split distributorship, and then suggested a date when Robco would stop supplying brick to Beehive. Young suggested a later date, May 16, 1986, and Jones agreed. Young asked about the million brick order. Jones told him that Robco could not produce the brick to Beehive's satisfaction, that Robco was willing to substitute other colors for the special color, and there had to be an end sometime, therefore, all brick, including the million brick order, would have to be picked up by May 16, 1986. Young did not suggest a date later than May 16.

Browning, on the other hand, states that this was not what was agreed to in the meeting because it was impossible for Beehive to complete its orders, including the million brick order, in the allotted thirty days because of the number of trucks required to ship the brick, the limited capacity of Beehive's yard, Beehive's $15,000 credit limitation with Robco, and his prior understanding that Beehive would have a year to complete the million brick order. Browning admitted that he did not object to the May 16 date set by Jones with respect to Beehive's other remaining orders.

On April 17, 1986, Jones sent Beehive a letter confirming Robco's termination of Beehive's distributorship. This letter stated that Robco was unable to produce the special color brick for Larkin, that Beehive was required to take delivery on all outstanding orders by May 16, 1986, and that Larkin could substitute other colors of brick to fill the million brick order. Beehive did not attempt to fill the remainder of the million brick order with the proffered substitute bricks.

Browning testified that Larkin was very disappointed in this development, and that, on April 18, 1986, Interstate Brick contacted Larkin in an attempt to get his million brick order. Although Browning did not know where Larkin bought his brick after May 16, he knew that Larkin had an account with Interstate and had bought Robco brick from Interstate. Jones, however, testified unequivocally that Robco did not contact Larkin in an attempt to divert his business from Beehive.

At this time, Beehive owed Robco $28,-609.97 on its open account, which it refused to pay, asserting that a Robco distributorship would have been worth two million dollars over twenty years.

Beehive sued Robco, alleging breach of contract. Robco answered and counterclaimed for the amount owing on the open account. Following substantial discovery, Robco moved for summary judgment. The trial court granted summary judgment, dismissed Beehive's complaint, and awarded Robco judgment on its counterclaim. Beehive filed its appeal.

Beehive asserts that the trial court erred in entering summary judgment against it because there are genuine issues of material fact regarding Robco's alleged breaches of contract concerning the million brick order, the split distributorship, and Robco's alleged interference with Beehive's customer, Emerson Larkin. Beehive further asserts that the trial court erred in dismissing its claim because there need not be an enforceable contract to support a claim of breach of covenant of good faith and fair dealing, and because Robco was unjustly enriched by Beehive's activities. Robco, on the other hand, accuses Beehive of bringing a frivolous appeal and, therefore, argues that Beehive is liable for Robco's costs and attorney fees.

The trial court found that Beehive's agreements regarding the million brick order and the split distributorship were barred by the provisions of Utah Code Ann. § 70A-2-201 (1981) because they were not supported by a written memorandum within the meaning of the statute of frauds.

## MILLION BRICK ORDER

■ To enforce a contract for the sale of goods over the amount of $500 pursuant to section 70A-2-201, there must be "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Utah Code Ann. § 70A-2-201. The purpose of this section is "to guard against the perils of perjury and to prevent the enforcement of unfounded claims." *N. Dorman & Co. v. Noon Hour Food Prods., Inc.*, 501 F.Supp. 294, 296 (E.D.N.Y.1980). This writing need not contain all the material terms of the contract, and the material terms need not be precisely stated. U.C.C. § 2–201, 1 U.L.A. 147 Official Comment 1. Instead, only three elements are required: "First, [the writing] must evidence a contract for the sale of goods; second, it must be signed, a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity." *Id.* at 147–48; *see also American Web Press, Inc. v. Harris Corp.*, 596 F.Supp. 1089, 1093 (D.Colo.1983).

■ The two documents presented by Beehive to substantiate its claim that a valid contract existed for the million brick order include the purchase order allegedly sent to Robco by Beehive sometime after October 14, 1985, and the April 17, 1986 letter sent by Robco to Beehive finally terminating the distributorship. While the October 14 purchase order does not satisfy the requirements of section 70A-2-201 because it is not authenticated in any manner by Robco, the April 17 letter merits examination. This letter states, in part, that "[t]he existing order for 1,000,000 Provincial Antique, (special color) for Emerson Larkin cannot be produced. We will allow substitutions with the following: Dover Gray, Heritage Antique, Provincial Antique and Provincial Antique Special Lot."

The letter is signed by Jones as a representative of Robco, and the phrase "1,000,-000 Provincial Antique (special color) for Emerson Larkin" specifies a quantity of specific goods to the contract. Thus, the

letter meets two of the three requirements under section 70A–2–201.

However, the letter is ambiguous as to whether it actually evidences a contract. Language is ambiguous when the words used to express the intention of the parties are insufficient in the sense that "the contract may be understood to reach two or more plausible meanings." *Property Assistance Corp. v. Roberts*, 768 P.2d 976, 977 (Utah Ct.App.1989) (quoting *Central Sec. Mut. Ins. Co. v. De Pinto*, 235 Kan. 331, 681 P.2d 15, 17 (1984)). Once we determine that a contract is ambiguous, parol evidence is admissible to determine the parties' intent. *Id.* at 977–78; *Power Systems and Controls, Inc. v. Keith's Elec. Constr. Co.*, 765 P.2d 5, 9–10 (Utah Ct.App.1988).

Robco asserts that the letter is merely a counteroffer and is not evidence of a contract, stating that the million brick agreement was conditional upon Robco's ability to successfully manufacture the special color of brick and that the purpose of the letter was to indicate that this could not be done. Instead, as an accommodation to Larkin, it offered alternate colors of brick to him. Consequently, it did not accept Beehive's offer and there was no contract. To reach this conclusion, Robco relies upon Utah Code Ann. § 70A–2–206(1) (1981), which states:

> Unless otherwise unambiguously indicated by the language or circumstances ... (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance ... by the prompt or current shipment of nonconforming goods, but such a shipment of nonconforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer.

To support this argument, Robco relies on Jones's sworn deposition to the effect that Larkin rejected all test lots of the brick.

On the other hand, Beehive asserts that the letter was actually evidence that a contract had been formed between the parties. Beehive's representatives testified that Larkin had used, rather than rejected, the bricks from the first two test lots, and had indicated to Robco from the outset that he was more than willing to use the Dover Gray color if Robco could not successfully produce the special color, thus accepting Robco's proffered performance and creating a contract. Therefore, the phrases "existing order" and Robco's allowance for substitutions in the letter should be interpreted to mean that a contract for the sale of the million bricks existed between the parties but that Robco was unable to perform as originally planned and, instead, offered the buyer a substitute performance.

Because disposition of a case on summary judgment denies the benefit of a trial on the merits, any doubt concerning questions of fact, including evidence and reasonable inferences drawn from the evidence, should be resolved in favor of the opposing party. *Frisbee v. K & K Constr. Co.*, 676 P.2d 387, 389 (Utah 1984); *Reeves v. Geigy Pharmaceutical, Inc.*, 764 P.2d 636, 640 (Utah Ct.App.1988). Therefore, we consider the evidence and the reasonable inferences therefrom in Beehive's favor.

Summary judgment is only proper where the pleadings, depositions, affidavits, and admissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ.P. 56(c); *Frisbee*, 676 P.2d at 389; *Reeves*, 764 P.2d at 639. If we conclude that a genuine issue of material fact exists, we must reverse the trial court's determination and remand for further proceedings. *Creekview Apartments v. State Farm Ins. Co.*, 771 P.2d 693 (Ct.App.1989); *Reeves*, 764 P.2d at 640. If we view the evidence and its reasonable inferences in favor of Beehive, then we accept its position that a verbal contract existed, based upon previous conversations and actions between the parties. The issue then remaining is whether the letter was evidence of an existing oral agreement, or merely a counteroffer by Robco, indicating that contract negotiations were ongoing. We deem this to be a genuine issue of material fact requiring further evi-

dence. Therefore, we remand for the trial court to resolve this factual ambiguity.

■ We note that under Utah Code Ann. § 70A–2–201(3)(c), the million brick order is enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted." Because Beehive has received and accepted large quantities of bricks under this order, it is liable to Robco for their purchase price, regardless of whether or not the million brick order is found to be enforceable upon remand.

## SPLIT DISTRIBUTORSHIP

■ The trial court concluded, as a matter of law, that Beehive was not entitled to relief on its claim that Robco breached an oral contract to award Beehive a split distributorship because it was "unsupported by any written memorandum as required by the statute of frauds."

Chapter 2 of the Uniform Commercial Code applies to transactions in goods,[1] Utah Code Ann. § 70A–2–102 (1981), not services. *See* U.C.C. § 2–102, 1 U.L.A. 115 note 4 (1976); *Computer Servicenters, Inc. v. Beacon Mfg. Co.*, 328 F.Supp. 653, 655 (D.S.C.1970). If service predominates, and the transfer of title to personal property is only an incidental feature of the transaction, the contract does not fall within the ambit of chapter 2. *Epstein v. Giannattasio*, 25 Conn.Supp. 109, 197 A.2d 342, 344 (1963).

A split distributorship, as contemplated by Beehive, is not identifiable as "goods" but is a service relationship because the primary purpose of a distributorship would have been to entitle Beehive to perform the service of selling Robco's products. Because service predominates in this alleged contract, it does not come within the ambit of Chapter 2, and the associated statute of frauds is inapplicable. Likewise, the general statute of frauds, Utah Code Ann. § 25–5–4 (1988), is inapplicable.[2]

Because the trial court ruled incorrectly, as a matter of law, on the issue of the alleged split distributorship, we reject its conclusion that this issue is barred because there is no written memorandum in the record memorializing its existence.

■ However, it is appropriate that we affirm the trial court's judgment if it can be sustained on any proper legal basis. *Taylor v. Estate of Taylor*, 770 P.2d 163, 169 (Utah Ct.App.1989). Because we conclude that there is no genuine issue of material fact concerning the existence of the alleged split distributorship, we affirm the trial court's summary judgment on this issue. Jones, in his sworn deposition, asserted that he had made no assurances to Beehive representatives that they would be awarded a split distributorship. Even viewing the record in the light most favorable to Beehive, its representatives did not testify that Jones had done any more than assure them that they *might* be awarded such a distributorship. Because the record is devoid of any firm commitment on Robco's part to offer Beehive a split distributorship, there is no factual dispute on this point. Therefore, we affirm the trial court's conclusion that Beehive did not have a cause of action against Robco on the issue of a split distributorship.

---

1. "Goods" are defined in Utah Code Ann. § 70A–2–105(1) (1981) as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities ... and things in action."

2. Utah Code Ann. § 25–5–4 (1988) states:
   In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof, is in writing subscribed by the party to be charged therewith:

(1) Every agreement that by its terms is not to be performed within one year from the making thereof.
(2) Every promise to answer for the debt, default or miscarriage of another.
(3) Every agreement, promise or undertaking made upon consideration of marriage, except mutual promises to marry.
(4) Every special promise made by an executor or administrator to answer in damages for the liabilities, or to pay the debts, of the testator or intestate out of his own estate.
(5) Every agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation.

It is an established principle in both civil and criminal cases that this court "need not analyze and address in writing each and every argument, issue, or claim raised and properly before us on appeal." *State v. Carter*, 776 P.2d 886, 886 (1989). Rather, the nature and extent of an opinion rendered by this court is largely discretionary with this court. *Id.* Because we find the issues which we have addressed to be dispositive of this appeal, we decline to address the parties' remaining issues.

Reversed and remanded for proceedings consistent with this opinion.

BENCH, J., concurs.

JACKSON, Judge (concurring and dissenting):

Although I agree with the majority's handling of the split distributorship claim, I dissent from the disposition and legal analysis of the claim arising from the contract for sale of the bricks. In my view, the majority misapplies the statute of frauds in assessing the sufficiency of the written memorandum and fails to understand the posture in which that issue is presented to us on appeal from the summary judgment entered below.

Beehive asserted a cause of action against Robco for breach of a contract to sell it one million bricks. Robco eventually moved for summary judgment on this claim, asserting that the parties' oral agreement was unenforceable because of the statute of frauds. Robco did *not* move for summary judgment on the basis that, on the undisputed facts, the parties had never reached an oral contractual agreement. The trial court has yet to resolve the factual dispute between the parties regarding the existence of a contract, a fact that is critical to Beehive's breach of contract claim but immaterial to the following legal question, which was put to the trial court on summary judgment and which this court should be answering on appeal: assuming there is an oral agreement to sell one million bricks to Beehive, as it alleges, is the writing legally sufficient to satisfy the applicable statute of frauds?

The only terms of the parties' contract the statute requires in writing, according to the majority, are the signature of the party to be charged and the quantity of goods, both of which are present in the letter of April 17, 1986. The only remaining question, then, is whether the writing evidences a contract for the sale of goods. In order to answer this question, it is first essential to identify what agreement Beehive claims to have orally reached with Robinson. This was not alleged to be an immediate purchase and sale of one million bricks in October 1985. According to Beehive, the parties orally agreed that Beehive could purchase, and Robco would sell, one million bricks—in the special color requested or in other, readily available stock colors—for resale to Larkin. One key term of this agreement, Beehive asserts, is that Beehive could purchase bricks from the total million-brick order in batches, as needed by Larkin, over a period of twelve to fourteen months, i.e., until mid-October to mid-December 1986.

Viewed in this context, the letter of April 17 is patently sufficient to evidence the claimed contract to sell one million bricks of whatever color. The letter acknowledges receipt of an order from Beehive for the one million bricks for Larkin, unequivocally says that Robco is willing to fill the order, and states that substitution of stock colors will be allowed because the special color requested cannot be produced. The fact that the April 17 letter cuts off the time period during which the bricks could be purchased by Beehive at May 16, 1986, instead of at the end of the period until October or December 1986 alleged by Beehive, only shows a present disagreement between the parties regarding the agreed-upon life of the contract. It has no bearing on the sufficiency of the writing under the statute of frauds since, according to the majority's interpretation of section 70A–2–201, the duration of the contract period during which Beehive could purchase the bricks is not a term that need be in writing.

The appropriate disposition, therefore, is to reverse the summary judgment on Beehive's second cause of action and remand for further proceedings. It will then be

Beehive's burden to prove that the parties reached an oral agreement and that one agreed-upon contractual term gave Beehive twelve to fourteen months in which to complete the purchase. If Beehive succeeds at this, then Robco would have breached the contract when it would not allow any purchases out of the million-brick Larkin order between May 17, 1986, and December 1986. Beehive would, of course, have to establish damage from this breach, presumably by showing the profits lost when Larkin purchased Robco brick from another middleman during that period. There is already ample evidence in the record of the existence of a consummated contract between the parties, including Robco's April 17 letter and the undisputed fact, recognized by the majority, that Beehive had received from Robco and resold to Larkin approximately 300,000 bricks out of the total million-brick Larkin order by May 16, 1986. Even if the factfinder was not convinced that the parties agreed to a contract life of twelve to fourteen months, it might find that the parties intended a reasonable time period for purchase by Beehive from the full order and that such a reasonable period extended past May 16, 1986.

In short, for purposes of this summary judgment, the existence of the agreement alleged by Beehive should be accepted as a given. Instead, the majority confusingly remands for resolution of a factual issue that has no real bearing on the question before us, even though Beehive will ultimately have to prove it had a contract before it can recover for any breach. The message to trial courts and attorneys is that you cannot ever resolve a contract enforcement claim in favor of a defendant by summary judgment based on the statute of frauds, *unless* defendant does not dispute the existence of the alleged oral agreement. As a practical matter, however, no defendant is going to admit that the parties reached an oral agreement because it could result in a waiver of the defense of the statute of frauds. *See* 2 A. Corbin, *Corbin on Contracts* §§ 498, 320 (1950 & Supp.1984); *see also Bentley v. Potter,* 694 P.2d 617, 621 (Utah 1984).

I see no reason why a defendant should not be able to deny the existence of the purported oral agreement, yet claim entitlement to summary judgment as a matter of law on the statute of frauds issue. Summary judgment is supposed to be the device by which a defendant can say to the trial court, "even according to the facts as contended by plaintiff, I am entitled to judgment as a matter of law." *See D & L Supply v. Saurini,* 775 P.2d 420, 421 (Utah 1989). The value of summary judgment proceedings in contract cases defended on the basis of a statute of frauds is obvious. If a writing does not satisfy the statute of frauds, a plaintiff cannot enforce an oral agreement even if one was, in fact, reached. In that situation, the parties and the judicial system are spared the time and expense of a meaningless trial on the issue of whether or not there was an oral contract. *See, e.g., Machan Hampshire Properties, Inc. v. Western Real Estate & Dev. Co.,* 779 P.2d 230 (Utah Ct.App.1989). If, however, the writing is sufficient under the statute of frauds, as I believe it is in this case, the plaintiff is entitled to the opportunity to prove at trial both that the parties have an oral contract and what the actual terms of that contract are.