2006 UT App 353

**ELLSWORTH PAULSEN CONSTRUCTION COMPANY, Plaintiff, Appellee, and Cross-appellant,**

v.

**51–SPR, L.L.C., Defendant, Appellant, and Cross-appellee.**

No. 20040507–CA.

Court of Appeals of Utah.

Aug. 31, 2006.

R. Stephen Marshall and Erik A. Olson, Durham Jones & Pinegar, Salt Lake City, for Appellant.

Mark L. Poulsen and Bret Reich, Nelson Snuffer Dahle & Poulsen PC, Sandy, for Appellee.

Before Judges BILLINGS, McHUGH, and ORME.

## OPINION

ORME, Judge:

¶1 This case arises from a real estate project gone bad. We have before us the appeal and cross-appeal from several aspects of the trial court's rulings. We reverse in part and affirm in part, and remand for additional proceedings.

## BACKGROUND

¶2 Plaintiff Ellsworth Paulsen Construction Company (Ellsworth) entered into two construction contracts with Guy Hatch and his company, Broadstone Investments, L.C. (Broadstone), under which Ellsworth agreed to act as general contractor for the construction of two commercial buildings (Building I and Building II) as part of a project in American Fork, Utah (the Northshore Prop-

erty). 51–SPR, L.L.C. (SPR), through its owner, Robert Chimento, entered into an agreement with Hatch and Broadstone (the Agreement), which provided, among other things, that SPR would contribute $2.9 million toward the purchase and development of the Northshore Property and take title to the property as a tenant in common with Broadstone. Based on the Agreement and SPR's actions, the trial court ruled on a partial summary judgment motion that SPR and Broadstone were joint venturers in the development of the Northshore Property and, thus, that SPR shared liability on the construction contracts Broadstone had entered into with Ellsworth.

¶ 3 Apparently, however, Ellsworth knew nothing about SPR's involvement in the project, having no direct dealings with SPR until Hatch disappeared toward the end of construction and Ellsworth sought payment on outstanding invoices that Hatch had left unpaid.[1] Until that time, Ellsworth had dealt exclusively with Hatch as the owner of Broadstone, Broadstone being designated under the Agreement as the project manager in charge of supervising construction on the Northshore Property.

¶ 4 To fund the construction, Broadstone had entered into two separate construction loan arrangements with Central Bank, which Hatch and a co-member of Broadstone, Dan Parkinson, personally guaranteed. Under the Agreement, Broadstone was "in charge of obtaining remaining needed construction financing and institutional permanent financing." The Agreement also required that Broadstone was to "provide financing for needed construction monies for the office building[s] and remaining cash needs of the project" beyond SPR's $2.9 million invest-ment. The Agreement also expressly provided that "Guy Hatch will guaranty such financing."

¶ 5 Prior to disappearing, and toward the end of construction on the Northshore Property, Hatch had become suspiciously slow in paying Ellsworth's invoices, apparently due to the fact that the construction loan funds were almost exhausted. At least according to SPR, Hatch had been drawing on the construction loan funds and using them in other projects unrelated to the Northshore Property. Despite not being paid, Ellsworth continued its work. Toward the end of the project, with the construction loan funds apparently exhausted and Hatch having disappeared, Ellsworth had nowhere to send its final three draw requests.

¶ 6 Throughout the earlier course of construction, Ellsworth would submit draw requests to Central Bank either directly or through Hatch. Once the draws were approved, Central Bank would then issue checks to Ellsworth for its work and for the work of its subcontractors. Each check bore a lien waiver provision on the reverse side of the instrument.[2] The trial court ruled on summary judgment that the lien waivers were valid and enforceable, and therefore cut off any lien rights through the date of each draw request, which is the date the draw was requested and not the date the check was received or cashed. In considering a subsequent motion for summary judgment, however, the trial court ruled that the indemnity provision within the lien waivers was inapplicable, invalid, and unenforceable, and that Ellsworth was not responsible to indemnify SPR against any subcontractor claims.

---

1. According to SPR, Hatch left Utah for Hawaii, where he apparently remains to this day.

2. The lien waiver provisions read, in pertinent part:

In consideration of payment of this check, payee by negotiating this check waives, releases, and relinquishes all right of lien or claims payee may have up to the date of the draw request described on the reverse side hereof (the "Draw Date"), upon the property described on the reverse side hereof (the "Property"). The payee certifies that this check is payment for labor and materials that were actually performed upon and furnished to the Property. Payee warrants and guarantees under penalty of fraud that payment in full has been made by payee to the suppliers of all labor and materials to the Property incurred up to the Draw Date at the insistence of payee. Payee agrees to indemnify and hold harmless the owner of the Property and Central Bank or its assigns, from any loss, claims, or expenses incurred by them by reason of or rising out of any liens or claims made against the Property by any supplier of labor [or] material at the insistence of payee.

¶ 7 After Hatch disappeared and the loan funds were exhausted, Ellsworth learned of SPR's involvement in the project and approached SPR directly for payment for the completed work. SPR, viewing itself as a mere investor or limited partner, disclaimed any obligation to pay Ellsworth or its subcontractors.[3] Ellsworth then filed a mechanic's lien against Building I and Building II, and commenced this action to foreclose the lien.[4] After initially ruling on a motion for summary judgment that there was a question of fact concerning whether Ellsworth's lien had been timely filed, the trial court reconsidered its ruling and concluded that the mechanic's lien was timely filed and otherwise valid. Also on summary judgment, the trial court dismissed Ellsworth's claim that SPR failed to obtain a payment bond.

¶ 8 Ellsworth brought additional claims against Hatch and Broadstone for, among other things, failure to pay amounts due under two construction contracts entered into pursuant to the Agreement. Ellsworth brought those same claims against SPR on the theory that SPR was in a joint venture relationship with Hatch and Broadstone in the development of the Northshore Property. SPR defended against these claims by initiating, in a separate proceeding which was later consolidated into this lawsuit, an action to quiet title in Building I and Building II. SPR also brought claims against Ellsworth under Utah's abusive lien statute, see Utah Code Ann. § 38–1–25 (2005), for including in its lien claim $78,000 that SPR asserted was attributable to an unrelated project on which Hatch and Ellsworth were collaborating without SPR's involvement.

¶ 9 A three-day bench trial was held on the issues not previously decided on summary judgment. At the conclusion of the trial, the

court ruled in Ellsworth's favor on its lien and breach of contract claims in the amount of just over $721,000. Although it disallowed the claim for $78,000, the trial court denied SPR's related abusive lien argument, holding that Ellsworth had acted in good faith in including the $78,000 in its lien claim and had not intended to exact more from SPR than was due. The trial court also granted Ellsworth attorney fees as the prevailing party under the lien statute, but refused to award Ellsworth pre-judgment contractual interest on its final three draws because Ellsworth never submitted those final draws and, thus, the court could not fix a date at which the contract was breached and from which interest began to accrue. Both sides now appeal various aspects of the trial court's resolution of this complicated dispute.

## ANALYSIS

### I. Joint Venture Ruling

 ¶ 10 SPR argues that the trial court erred in concluding, on partial summary judgment, that it was in a joint venture relationship with Broadstone and Hatch. Specifically, SPR attacks the trial court's conclusion that SPR had a duty to share in the losses of the Northshore Property. Because there is a genuine issue of material fact regarding the key issue of whether SPR agreed to share losses with Broadstone and Hatch, we reverse the trial court's partial summary judgment ruling.

 ¶ 11 The "duty to share in any losses" is one of the elements of a joint venture relationship that the Utah Supreme Court has deemed to be "essential" to the existence of such a relationship. *Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974).[5] *See also Betenson v.*

---

**3.** Shortly before Hatch disappeared, SPR learned of Hatch's purported misuse of the Northshore Property construction funds, SPR confronted Hatch, and Hatch agreed to relinquish to SPR Broadstone's one-half interest in the property. By the time SPR assumed control of the Northshore Property, Broadstone had defaulted on the two construction loans.

**4.** Several of Ellsworth's subcontractors also filed mechanics' liens and the trial court granted summary judgment in favor of the subcontractors who had filed liens. To avoid foreclosure of

those liens, SPR apparently paid those claims, leaving only Ellsworth's lien and contract claims remaining to be resolved. Thus, this appeal involves only Ellsworth's claims against SPR.

**5.** The Utah Supreme Court has stated the "essential" elements of the joint venture relationship as follows:

The parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be a community of interest in the performance of the common

*Call Auto & Equip. Sales, Inc.*, 645 P.2d 684, 686 (Utah 1982). It goes without saying that a duty to share losses is present in a relationship where a "written agreement specifically provide[s] for the sharing of losses." *Harline v. Campbell*, 728 P.2d 980, 983 (Utah 1986). Likewise, where the sharing of losses is "specifically excluded by [an] agreement," no duty to share losses can be found to support a conclusion that parties are in a joint venture relationship. *Betenson*, 645 P.2d at 686. Where, however, an agreement fails to specifically provide for or exclude a duty to share losses—which we conclude is true of the Agreement in this case—courts are faced with a more difficult determination.

¶ 12 Ellsworth argues that in such instances a duty to share losses may be inferred from an agreement or from the nature of the parties' relationship, especially when all the other elements of a joint venture relationship are present. While the Utah Supreme Court has indicated that "the agreement to share losses need not necessarily be stated in specific terms ... to permit [a] court to infer that the parties intend[ed] to share losses as well as profits," *Bassett*, 530 P.2d at 2, Utah case law does not appear to support the notion advanced by Ellsworth that Utah courts have routinely made such an inference on summary judgment. Instead, "any doubt concerning questions of fact, including evidence and reasonable inferences drawn from the evidence, should be resolved in favor of the [party opposing summary judgment]." *Beehive Brick Co. v. Robinson Brick Co.*, 780 P.2d 827, 831 (Utah Ct.App.1989). Inferring on summary judgment a duty to share losses runs counter to this precept.[6]

¶ 13 The trial court concluded that "[t]he terms of the Agreement, SPR's ownership interest in the Project, and SPR's undisputed actions all gave rise to SPR's duty to share in any losses which may be sustained by the Project." Ellsworth argues that the trial court properly inferred from the Agreement, SPR's undisputed actions, and the other undisputed facts that SPR had the duty to share in losses. We disagree because when "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to [SPR]," there is a genuine dispute of fact on a material issue, which precludes summary judgment. *Surety Underwriters v. E & C Trucking, Inc.*, 2000 UT 71, ¶ 15, 10 P.3d 338. *See also Beehive*, 780 P.2d at 832.

¶ 14 " 'A genuine issue of fact exists where, on the basis of the facts in the record, reasonable minds could differ' on any material issue." *Ron Shepherd Ins., Inc. v. Shields*, 882 P.2d 650, 655 (Utah 1994) (citation omitted). Here, on the material issue of whether SPR had a duty to share losses, a genuine issue of fact arises out of reasonable inferences that can be drawn from a combination of the Agreement itself; the affidavit testimony of Robert Chimento, the owner of SPR; and other undisputed facts before the court.

¶ 15 Although the trial court regarded Chimento's affidavit testimony as nothing more than "bald assertions" and "conclusory allegations" that did not "create any genuine issue of material fact" because they were "sharply contradicted by both the terms of the Agreement and the undisputed facts," we conclude that Chimento's affidavit *did* create an issue of fact concerning the duty to share losses. Indeed, when Chimento's affidavit testimony is viewed together with the Agree-

---

purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and unless there is an agreement to the contrary, a duty to share in any losses which may be sustained.

*Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974). The trial court concluded on summary judgment that all the other essential elements were also present in the relationship between SPR and Broadstone, a conclusion SPR does not dispute on appeal.

**6.** It appears, then, that in most instances where there is no express agreement between parties concerning the sharing of losses, the question of whether one has a duty to share in losses will ordinarily be a question of fact—just as the overarching question of "[w]hether a joint venture exists is ordinarily a question of fact," *Strand v. Cranney*, 607 P.2d 295, 296 (Utah 1980)—because the joint venture relationship itself "does not always arise pursuant to formal agreement." *Rogers v. M.O. Bitner Co.*, 738 P.2d 1029, 1032 (Utah 1987). Of course, where the facts are truly not in dispute, the duty to share losses, or the existence of a joint venture for that matter, may be determined as a matter of law. *See Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974).

ment's provisions, several of the provisions, rather than "sharply contradict[ing]" his testimony, actually lend credence to his assertions and give rise to reasonable inferences favorable to SPR's position.

¶ 16 Chimento's affidavit asserts that under the Agreement the parties intended to make Hatch and Broadstone solely responsible for "all expenses, costs, losses, and risks associated with the Northshore project" and did not intend to make SPR liable for any losses, liabilities, or responsibilities, meaning that SPR stood only to lose its capital investment in the Northshore Property. The provisions in the Agreement that expressly release SPR from all obligations arising by way of any note or guaranty for construction financing and instead place the sole obligation of obtaining and repaying construction financing and other cash needs of the project on Broadstone and Hatch, at the very least give rise to the inference that SPR did not agree to share in other financial obligations, i.e., the net operating losses of the Northshore Property. Additionally, the Agreement's terms guarantying SPR "a 10% return on its capital commencing December 1, 2000," with Broadstone and Hatch guarantying to even "contribute any and all sums to the project needed for payment of such return," support Chimento's affidavit and the inference that even if the project lost money, Broadstone alone bore the responsibility to contribute funds to cover the losses and to ensure that SPR, as an investor, received its guarantied return.

¶ 17 Other terms of the Agreement that the trial court interpreted as having "essen-tially put SPR's $2.9 million immediately at risk should the venture completely fail" and making "SPR one-half owner of a tenancy in common with all the accompanying liabilities of a real property owner," when viewed in their proper light on summary judgment, together with Chimento's affidavit, also give rise to equally plausible inferences that contradict the trial court's conclusion that SPR agreed to share in the losses of the project.[7] In addition, SPR's "undisputed actions" on which the trial court relied to conclude SPR was not acting as a mere investor—i.e., "when it agreed with Central Bank in April, 2002 to guarantee 'Broadstone's' [$]4.3 million construction loans" and when it "voluntarily conveyed the Project property to Broadstone for one day in January 2001 so that Broadstone could secure additional financing for the Project"[8]—when viewed in the light most favorable to SPR, also support the assertion that SPR may not have agreed to share in losses.

¶ 18 While we do not suggest that the inferences the trial court drew from the Agreement and other evidence before it are necessarily incorrect, the fact that there are other equally plausible inferences to be drawn from the evidence manifests that summary judgment should not have been granted. *See Goodnow v. Sullivan*, 2002 UT 21, ¶ 18, 44 P.3d 704 (Wilkins, J., concurring in the result) ("Where, as here, equally plausible contrary inferences may be drawn, neither party should have been granted summary judgment."). Indeed,

[a] party opposing the motion is required only to show that there is a material issue

---

**7.** For example, the fact that SPR's capital investment was put at risk by the Agreement quite reasonably supports the inference that SPR, like any investor, stood only to lose its investment and nothing more if the project failed. Moreover, much like in the realm of partnerships, holding property as tenants in common does not by itself establish a joint venture relationship. *Cf.* Utah Code Ann. § 48-1-4(2) (2002) ("Joint tenancy, tenancy in common, tenancy by entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.").

**8.** The trial court inferred from these actions that "[SPR] voluntarily put its own property at greater risk of loss" than would an "investor" or

"simple creditor," and that SPR had thereby waived the protection of language in the Agreement limiting SPR's obligation arising by reason of any note or guaranty for construction financing. The court concluded that these actions manifested SPR's duty to share in losses. But it is equally plausible to infer from such actions that SPR was merely acting to protect its investment—and the potential return on its investment—by seeking to avoid foreclosure of the construction loans. Moreover, by mortgaging its interest in the Northshore Property, SPR did put the property at risk, but arguably only stood to lose its capital investment—which was used to purchase the property in the first place—and nothing more.

of fact. Affidavits and depositions submitted in support of and in opposition to a motion for summary judgment may be used only to determine whether a material issue of fact exists, not to determine whether one party's case is less persuasive than another's or is not likely to succeed in a trial on the merits.

*Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 928 (Utah 1993). We therefore reverse the trial court's judgment on this issue and remand for a determination by the fact finder whether SPR had a duty to share in the losses of the project.[9]

## II. Timeliness of Ellsworth's Mechanic's Lien

¶ 19 SPR argues that the trial court erred when it determined on summary judgment that Ellsworth's mechanic's lien was timely filed on November 16, 2001. Specifically, SPR claims the trial court erred in concluding that there was nontrivial, substantial work performed on Building I and Building II in September 2001 and October 2001 at "the request of Broadstone and/or SPR" and that the ninety-day filing period did not begin to run until that work was completed. SPR asserts that there were, on the record before the court, genuine issues of material fact concerning whether the Building I contract was completed by May 2001, whether the Building II contract was completed by July 2001, and whether any work performed after these dates fell within the scope of the original building contracts and was substantial enough to preclude the start of the ninety-day filing period. Likewise, SPR contends there is a question of material fact concerning when the owner's acceptance of Ellsworth's work occurred. We agree with SPR that summary judgment on these issues was also improperly granted.

¶ 20 "Utah courts have articulated a two-prong test" for determining whether a mechanic's lien has been timely filed. *Interiors Contracting, Inc. v. Smith, Halander & Smith Assocs.*, 827 P.2d 963, 965 (Utah Ct.

App.1992). Under the two-part test, "completion," as it appears in the applicable statute, *see* Utah Code Ann. § 38–1–7(1)(a) (2005), occurs when (1) the work under the contract "has been 'substantially completed,' leaving only minor or trivial work to be accomplished," and (2) the work " 'has been accepted by the owner.' " *Interiors*, 827 P.2d at 965 (citations omitted). "The decision as to whether the work at issue is substantial or trivial is fact sensitive," *id.* at 966, and "generally it is for the trier of fact to determine whether the additional work was trivial or minor." *Carlisle v. Cox*, 29 Utah 2d 136, 506 P.2d 60, 62 (1973). Likewise, the question of owner acceptance is often fact dependent, especially where the owner is alleged to have withheld acceptance until certain remaining items of work were completed. *See Interiors*, 827 P.2d at 967–69. Of course, if the record is clear and the facts are undisputed, those questions may be determined as a matter of law. *See Carlisle*, 506 P.2d at 62. Such, however, is not the case here.

¶ 21 While it appears to be undisputed that some work continued on Building I and Building II after May 2001 and July 2001, respectively, both parties presented evidence on summary judgment that supported conflicting completion dates and cast doubt on the scope of the work performed on or after August 15, 2001—ninety days before Ellsworth filed its mechanic's lien. When we view all of the facts and reasonable inferences to be drawn therefrom in the light most favorable to SPR's position, *see Surety Underwriters v. E & C Trucking*, 2000 UT 71, ¶ 15, 10 P.3d 338; *Beehive Brick Co. v. Robinson Brick Co.*, 780 P.2d 827, 831 (Utah Ct.App.1989), we conclude that there is a dispute of fact concerning (1) the date the buildings were completed, (2) the nature and scope of work performed on Building I after May 2001 and on Building II after July 2001, and (3) when owner acceptance occurred.

¶ 22 The fact that SPR can point to documents wherein Ellsworth certified that the

---

9. SPR would have us rule as a matter of law that it had no duty to share in the losses and was therefore not a joint venturer with Broadstone. Even if we were to agree that the affidavits and undisputed facts entitled SPR to that conclusion

as a matter of law—which we do not—SPR did not file a cross-motion for summary judgment, and we would therefore be procedurally constrained from entering judgment in its favor on this issue in any event.

entire Building I contract was 100% complete in May 2001 and that a subcontract was 100% complete in March 2001—the same subcontract on which Ellsworth relies to contend that work was still being performed on Building I as late as September 2001—adequately puts into dispute Ellsworth's "living, breathing witness testimony" that "extensive work after the dates of substantial completion" and "after the date of [Ellsworth's] invoices" was performed pursuant to the original contract. It also raises questions about the nature and triviality of work performed on Building I after those dates. Moreover, SPR raises a genuine issue of material fact regarding the substantial or trivial nature of the work performed on Building I when any work performed after May 2001 is considered in light of the total contract price. *See Interiors*, 827 P.2d at 967 (approving trial court's conclusion that substantial completion had occurred where work performed after the completion date had a de minimis dollar value in comparison to the total contract price); *Carlisle*, 506 P.2d at 62 (same).

¶ 23 In addition, evidence that Ellsworth certified that the Building II contract was 100% complete in July 2001 and that its subcontractors' invoices reflecting that they had completed all their work by July 2001—even though the same subcontractors performed more work on Building II after July 2001—raises a genuine issue of material fact concerning when substantial completion occurred. This determination is especially unclear in light of evidence SPR advanced to show the minimal value of the work performed after July 2001.

■ ¶ 24 Ellsworth asserts that SPR's contentions should fail "in the face of compelling—if not overwhelming—evidence that contravenes [SPR's] conclusory contentions" and "in the face of extensive testimony by subcontractors and [Ellsworth] that they were all performing thousands—perhaps tens of thousands—of dollars of work on the project during the months of August, September and October." Ellsworth's assertions are unavailing, however, since summary judgment cannot be granted based on the credibility and weight of the parties' respective evidence. *See Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 928 (Utah 1993) (stating that the evidence presented on summary judgment "may be used only to determine whether a material issue of fact exists, not to determine whether one party's case is less persuasive than another's or is not likely to succeed in a trial on the merits").[10] On the contrary, "[t]rial courts must avoid weighing evidence and assessing credibility when ruling on motions for summary judgment."[11] *Trujillo v. Utah Dep't of Transp.*, 1999 UT App 227, ¶ 42, 986 P.2d 752. As noted above, to oppose a motion for summary judgment a party "is required only to show that there is a material issue of fact," and not to show that "one party's case is less persuasive than another's or is not likely to succeed in a trial on the merits." *Lamb*, 869 P.2d at 928. We therefore reverse the court's judgment on this issue and remand for appropriate reconsideration of the issue of lien timeliness.

### III. Ellsworth's Inclusion of $78,000 in its Lien Claim

¶ 25 Both parties appeal the trial court's ruling concerning $78,000 Ellsworth included in its lien claim. Ellsworth contends that since it was entitled to claim the $78,000 as part of its lien claim, the trial court erred in not awarding the $78,000 as part of its lien and contract claims. SPR contends that the

---

10. This familiar pronouncement is contrary to a startling statement by Professor David A. Thomas that a Utah Supreme Court case, *McBride v. Jones*, 615 P.2d 431 (Utah 1980), supports the proposition that "[e]ven if the averments of the parties are in disagreement, summary judgment can be granted based on the credibility of the parties' respective evidence." David A. Thomas, *Utah Civil Practice* § 8.14[5][c][i], at 8–102 (2005). But the Supreme Court's treatment of the trial court's grant of summary dismissal in *McBride* actually stands for quite the opposite proposition. *See* 615 P.2d at 432–34.

11. The trial court's summary judgment ruling includes "Findings" that, indeed, appear to be true findings of fact reached by weighing evidence and assessing credibility rather than the misnomer we often see employed in a written ruling on summary judgment, where what is really a recitation of undisputed facts will appear under the heading "Findings."

trial court erred in not holding Ellsworth liable under Utah's abusive lien statute for including the $78,000 in its lien claim on the Northshore Property for work performed on an unrelated piece of property. We take up each contention in turn.

### A. Ellsworth's claim to the $78,000

¶ 26 Ellsworth argues that the trial court erred by not holding SPR liable to pay Ellsworth the $78,000, advancing several theories on appeal in support of its contention. We conclude, however, that the trial court was correct. Given the trial court's findings and conclusions, Ellsworth is not entitled to recover the $78,000 under any of the theories advanced. The trial court explicitly found that Ellsworth paid the $78,000 to Hatch for work on the proposed development of a different piece of property, that it did not relate to Hatch's agreements with Mr. Chimento and SPR for the construction of Building I and Building II, and that Broadstone was responsible for repaying the amount to Ellsworth. Ellsworth has made no earnest attempt on appeal to challenge the trial court's findings concerning the $78,000. *See Chen v. Stewart,* 2004 UT 82, ¶ 19, 100 P.3d 1177 ("In order to establish that a particular finding of fact is clearly erroneous, '[a]n appellant must marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence.' ") (citation omitted).

¶ 27 The plain language of the Mechanics' Liens statute makes clear that Ellsworth was only entitled to record or file a "lien upon the property upon or concerning which [it has] rendered service, performed labor, or furnished or rented materials or equipment for the value of the service rendered, labor performed, or materials or equipment furnished or rented." Utah Code Ann. § 38-1-3 (2005). Although Ellsworth would be entitled to file a lien for services rendered even if the planned development never occurred, the lien must nevertheless be filed against "the property concerning which [it] has rendered professional service." *Zions First Nat'l Bank v. Carlson,* 23 Utah 2d 395, 464 P.2d 387, 388 (1970). Given that the trial court found the $78,000 was not related to the Northshore Property, but rather to another of Hatch's projects, Ellsworth was not entitled to include the $78,000 as part of its lien on the Northshore Property.

¶ 28 Ellsworth insists, however, that the trial court's findings do not prevent the conclusion that when Hatch signed a change order indicating that the $78,000 was to be part of the Building II contract, Hatch made the $78,000 a "partnership" debt, for which SPR should be equally responsible. But even assuming that a joint venture existed between Hatch and SPR, the trial court's findings prevent imposing liability on SPR for the change order.

¶ 29 It is true that "[e]very partner is an agent of the partnership for the purpose of its business, and the act of every partner . . . binds the partnership," Utah Code Ann. § 48-1-6(1) (2002), but that binding authority does not extend to "[a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way." *Id.* § 48-1-6(2). The business of this alleged partnership or joint venture was the development of the Northshore Property. And the findings are clear that the $78,000 was unrelated to the Northshore Property and not part of the Agreement between Hatch and SPR. By the trial court's findings, then, the $78,000 was for use on another of Hatch's own business undertakings, completely unrelated to the Northshore Property. Absent some showing that the trial court's findings in this regard were incorrect and absent an affirmative finding that the $78,000 was indeed related to the business of this alleged partnership, Hatch's act of signing a change order in an apparent attempt to make his unrelated obligation part of the partnership business has no binding effect on SPR under partnership law.[12] *See id.* We

---

12. A more simplistic example may help to explain our analysis: Aimee and Brian form a partnership in order to purchase and develop property into a strip mall. Aimee and Brian contract with general contractor Catherine to develop the land. Construction progresses as expected with Aimee and Brian signing various change orders throughout the project. During the construction, Brian offers to buy a pair of skis that he notices on Catherine's truck. Cath-

therefore decline to disturb the trial court's findings and conclusions concerning Ellsworth's inclusion of this $78,000 in its lien claim.

## B. Violation of Utah's Abusive Lien Statute

¶ 30 The question remains whether the trial court properly concluded that Ellsworth did not violate Utah's abusive lien statute by including $78,000 as part of its lien claim when the trial court ultimately held that Ellsworth was not entitled to do so. The trial court concluded that although Ellsworth was not entitled to include the $78,000 amount in its lien claim, it "acted in good faith in claiming the $78,000." The court found that Ellsworth had filed the lien pursuant to Hatch's change order and Hatch's instructions, and that Ellsworth did not cause the lien to be filed with an intent to cloud the title of the property, to exact more than it believed was due, or to procure an unjustified advantage. SPR contends the abusive lien statute does not condition liability on a lien claimant's subjective belief that it is seeking more than is due and does not require a showing that the lien claimant specifically intended to exact more than is due. Thus, SPR contends that Ellsworth should have been penalized under the abusive lien statute for including $78,000 more in its lien claim than it was legitimately owed for work on the Northshore Property. We disagree.

erine is willing to sell them, and she and Brian decide on a price of $500. Brian, a little short on cash, memorializes the deal on a change order form, assuring Catherine she will be paid in due course. Toward the end of construction, Brian loots the remaining construction loan funds and absconds to Venezuela, taking with him the skis for which he never paid. Aimee is unable to pay the outstanding draw requests and Catherine files a mechanic's lien on the property and institutes a breach of contract action and an action to foreclose the lien. Catherine includes the $500 change order amount for the skis in her lien claim and also seeks recovery of the $500 from Aimee as a partnership debt. Clearly, Catherine is not entitled to recover the $500 as part of her lien or from Aimee as a partnership debt. Although a little more involved than the simple purchase of a pair of skis for $500, the situation is essentially the same here given the trial court's unchallenged findings.

¶ 31 The abusive lien statute provides that "[a]ny person entitled to record or file a lien under Section 38–1–3 is guilty of a class B misdemeanor who intentionally causes a claim of lien against any property, which contains a greater demand than the sum due to be recorded or filed" and the person does so "(a) with the intent to cloud the title; (b) to exact from the owner or person liable by means of the excessive claim of lien more than is due; or (c) to procure any unjustified advantage or benefit." Utah Code Ann. § 38–1–25(1) (2005).[13] The statute is peculiarly phrased, in that while the language of subsection (1) provides that the lien claimant must *intentionally* cause a lien to be filed that demands more that the lien claimant is due, one of the subsections provides a further requirement concerning mental state while the other two do not. Thus, subsection (1)(a) speaks of "the intent to cloud the title," while subsections (1)(b) and (1)(c) do not further prescribe what culpable mental state the lien claimant must have with respect to filing the lien "to exact ... more than is due" or "to procure any unjustified advantage or benefit." *Id.* But the abusive lien statute is a criminal statute and it does not "clearly indicate[ ] a legislative purpose" to impose strict liability for the crime. Utah Code Ann. § 76–2–102 (2003). As a result, the default culpable mental state of "intent, knowledge, or recklessness shall suffice to establish criminal responsibility" under the last two variants of the abusive lien statute.[14] *Id.*

13. Besides the bite the criminal penalty puts into the abusive lien statute, a person who violates the statute is also liable "to the owner of the property or an original contractor or subcontractor who is affected by the lien for the greater of" double the amount by which the lien exceeds what is actually due, or the actual damages incurred. Utah Code Ann. § 38–1–25(2) (2005).

14. Construing the abusive lien statute in this manner comports with the "fair import" of the statute's terms and "the objects of the law." Utah Code Ann. § 76–1–106 (2003). Moreover, it assures that the abusive lien statute continues "to discourage outrageous lien claims," *J. Pochynok Co. v. Smedsrud*, 2003 UT App 375, ¶ 19, 80 P.3d 563, *rev'd on other grounds*, 2005 UT 39, 116 P.3d 353, and "abuse of the lien process by creating a strong disincentive for a would-be litigant to wrongly inflict a mechanic's lien on a property owner whose property was not actually enhanced," *A.K. & R. Whipple Plumbing & Heat-*

¶ 32 The trial court specifically found that Ellsworth "did not cause the lien to be filed with the intent to cloud the property to exact more than it believed was due or procure an unjustified advantage." Although SPR contends that this finding is immaterial because the abusive lien statute does not require a showing of an intent "to exact ... by means of the excessive claim of lien more than is due," Utah Code Ann. § 38–1–25(1)(b), given our application of the default culpable mental state as explained above, the finding *is* pertinent to the trial court's holding. Despite SPR's thorough efforts to marshal the evidence and challenge several of the trial court's findings, SPR has not established that these findings are clearly erroneous. *See Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177. Although SPR asserts that its difficultly in marshaling the evidence supporting a finding of no intent typifies the problem inherent in proving a negative, SPR has ignored evidence that supports the inference that Ellsworth did not intentionally, or even recklessly, include the $78,000 to exact more than it believed it was due.

¶ 33 Ellsworth relied on Hatch's signed change order referencing the Northshore Property as providing a contractual basis under which it could include the $78,000 in its lien claim on the Northshore Property. While Ellsworth's reliance ultimately has proven to be incorrect, it at least provides evidence that tends to support the finding that Ellsworth included the amount based on what it thought was a legitimate and binding change order and did not intentionally, knowingly, or recklessly include the amount to exact more than was due.

¶ 34 Although SPR points to other evidence giving rise to inferences about what Ellsworth knew or did not know about the

$78,000, we are not convinced that the trial court's finding was clearly erroneous. Thus, although Ellsworth "intentionally cause[d] a claim of lien ... which contain[ed] a greater demand than the sum due to be recorded or filed," it did not do so with the requisite culpable mental state to cloud the title, to exact from the owner more than was due, or to procure some other unjustified advantage.

## IV. Lien Waivers

¶ 35 We next consider two aspects of the applicability of the lien waivers at issue in this case. With respect to both, we remand for further consideration.

### A. Application of Lien Waivers

¶ 36 SPR argues that the trial court erred by ultimately not applying the lien waivers after correctly concluding before trial that the lien waivers were valid and enforceable.[15] We admit we are slightly puzzled by the trial court's handling of the lien waiver issue, especially since neither party points us to a clear finding or explanation concerning why none of the lien waivers, held to be valid and enforceable in the abstract, were made applicable by the trial court. Indeed, both sides assert different draw dates that are supposed to have cut off Ellsworth's lien rights for work performed prior to those dates. SPR asserts dates (April 11 and June 25, 2001) that if found to be the draw dates would indeed waive Ellsworth's right to file a lien for some portions of the work it claimed in its mechanic's lien. The draw dates on which Ellsworth relies (each sometime in February 2001) would support the conclusion that no portion of its lien claim was waived by the April and June checks to which SPR cites in support of its position.

*ing v. Guy*, 2004 UT 47, ¶ 24, 94 P.3d 270, without chilling a legitimate lien claimant's right to file a mechanic's lien for any amount that may be due. Thus, lien claimants need to be wary of using the mechanic's lien process to intentionally, knowingly, or recklessly seek more than they are due, or to push some other abusive advantage. But where a lien proves to have been overstated for some other reason that does not violate the abusive lien statute, claimants need not fear the criminal liability or civil penalties the statute imposes.

15. On summary judgment, the trial court deemed the lien waivers applicable and held with respect to the lien waiver language that

> [b]y endorsing the Central Bank checks, Ellsworth ... waived [its] claims and lien rights for work performed prior to the date that [its] draws were requested, but not for work performed subsequently. The date of the draw request is the date on which [Ellsworth] requested the draw, not the date the check was received or cashed.

This ruling was not challenged on appeal.

¶ 37 Despite Ellsworth's contention that the trial court "implicitly" found at trial that there was no portion of the lien claim that was waived by the April and June checks, and despite its assertion that it put on extensive evidence supporting such a finding, the conflicting evidence and the lack of a clear ruling by the trial court prevents us from subscribing to Ellsworth's position. We therefore remand the issue for the trial court to clarify its treatment of the valid lien waivers and to make related findings relevant thereto.

## B. Indemnity, Warranty, and Guaranty Language of the Lien Waiver

¶ 38 We reverse the trial court's summary judgment ruling that, although the lien waivers were otherwise valid and enforceable, the indemnity language in the lien waiver provisions was "inapplicable, invalid and unenforceable." We give no particular deference to a trial court's interpretation of unambiguous contract language on summary judgment. *See Meadow Valley Contrs., Inc. v. Transcontinental Ins. Co.*, 2001 UT App 190, ¶ 13, 27 P.3d 594. As the lien waiver provisions are contractual in nature, when interpreting their language we "look[ ] at the entire contract and all of its parts in relation to each other, giving an objective and reasonable construction to the contract as a whole." *Sears v. Riemersma*, 655 P.2d 1105, 1108 (Utah 1982). The trial court's view of what was required in order for the indemnity language to be applicable misconstrued its purpose in the lien waiver provision and unreasonably read the indemnity language out of the lien waivers. Likewise, when the guaranty and warranty language of the lien waiver provisions is properly construed in the context of the lien waiver agreement, those provisions are also valid and enforceable.

¶ 39 Here, as part of the valid lien waiver provisions, the applicability of the indemnity and guaranty language hinges on the relevant draw dates for each check, as is so with the specific lien waiver language itself. Under the plain language of the lien waiver provisions, when construed together as a whole, the "[p]ayee warrants and guarantees" that through the draw dates "payment in full has been made ... to the suppliers of all labor and materials to the Property incurred at the insistence of payee." To the extent "any liens or claims" are "made against the Property by any supplier of labor [or] material" provided up through the relevant draw date, the payee, by signing the lien waiver provision, "agrees to indemnify and hold harmless the owner of the Property ... from any loss, claims, or expenses incurred by [the Property owner] by reason of or rising out of any liens or claims made against the Property." Thus, as with the question of whether Ellsworth has waived any amounts contained in its mechanic's lien claim, whether Ellsworth must indemnify SPR for any of the lien claims brought against it by Ellsworth's subcontractors and suppliers depends on whether any of those liens arose out of work performed before the draw date of a specific check that Ellsworth signed and also guarantied that it had paid. As to any such lien or claim, Ellsworth would be responsible for the payment by way of its guaranty and its agreement to indemnify the Property owner therefore. Accordingly, we remand for the trial court to make any additional findings necessary to determine the effect, if any, the indemnity, warranty, and guaranty language has on the liens filed against the Northshore Property and to determine any relief to which SPR may be entitled under those provisions.

## V. Prejudgment Interest

¶ 40 Ellsworth appeals the trial court's prejudgment interest determination. While we need not address this issue as our decision today reverses the final judgment in several respects and remands several issues for the trial court's further consideration, we nonetheless choose to treat the prejudgment interest issue here because it could well arise again during the proceedings on remand. *See Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 22, 20 P.3d 388 ("[W]here an appellate court finds that it is necessary to remand a case for further proceedings, it has the duty of 'pass[ing] on matters which may then become material.' ") (citation omitted).

¶ 41 Ellsworth argues that the trial court erred in refusing to award Ellsworth interest

on the amounts of the three final payment applications as part of the prejudgment interest award. The trial court held that because it was undisputed that Ellsworth never submitted the three applications to *anyone* for payment, it was "not possible for the [c]ourt to set a specific date on which payment of the three unsubmitted applications became due," and it refused to "simply 'pick a date' from which interest beg[an] to accrue." Ellsworth argues that because the terms of its contract with Broadstone provide for contractual interest to accrue, it was entitled to interest accrued on the amounts of these three payment applications.

¶ 42 Ellsworth's contention that the trial court's ruling appears to blur the distinction between the requirements for receiving an award of contractual interest and those for receiving an award of prejudgment interest as a matter of damages is well taken. *See Consolidation Coal Co. v. Utah Div. of State Lands & Forestry,* 886 P.2d 514, 528 n. 23 (Utah 1994) ("'A distinction exists between interest stated by the terms of a contract to be paid before its breach and interest recoverable by way of damages after a breach, although the term "interest" is often used indiscriminately to describe both amounts.'") (citation omitted). "Prejudgment interest may be awarded in a case where the loss is fixed as of a particular time *and the amount of the loss can be calculated with mathematical accuracy," Jorgensen v. John Clay & Co.,* 660 P.2d 229, 233 (Utah 1983), which makes such an award discretionary and dependent on finding that the debt was or became liquidated. *See Bjork v. April Indus., Inc.,* 560 P.2d 315, 317 (Utah) (stating general requirements for receiving an award of prejudgment interest), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977). In contrast, "'[c]ontractual interest is the creature of contract and is recoverable only as provided by its terms.'" *Consolidation Coal,* 886 P.2d at 528 n. 23 (citation omitted). Where an agreement provides for contractual interest to accrue, that interest becomes "an integral part of the debt as the principal itself," *Farnworth v. Jensen,* 117 Utah 494, 217 P.2d 571, 575 (1950) (internal quotations, citation, and emphasis omitted), and it is not discretionarily

awarded. *See* Utah Code Ann. § 15-1-4(2)(a) (2005) ("[A] judgment rendered on a lawful contract shall conform to the contract and shall bear the interest agreed upon by the parties[.]").

¶ 43 The difficulty we have here with the trial court's treatment of the prejudgment interest issue is that, while explicitly holding that Ellsworth was "entitled to pre-judgment contractual interest on its breach of contract claim as requested," the trial court nevertheless refused to award interest attributable to the three payment applications. It is not clear whether the trial court did so because under the general rules governing prejudgment interest the amounts due on the three payment applications were not liquidated, or whether the trial court determined that under the terms of the contract Ellsworth was not entitled to contractual interest on the three payment applications because it never submitted them for payment.

¶ 44 It may very well be that under the terms of the contract Ellsworth is not entitled to interest on the payment applications because they were never submitted. The contract states, with our emphasis, that interest is to accrue at "[t]en percent (10%) per annum thirty (30) days *after the date of the Invoice for payment."* Since it was undisputed that Ellsworth never submitted the three applications, there appears to be no "date of the Invoice for payment" that marks the beginning of the thirty-day period before interest would begin to accrue, which under the plain language of the contract suggests that contractual interest on those applications would be inappropriate. *See Consolidation Coal,* 886 P.2d at 528 n. 23. Yet if, as Ellsworth contends, the payment applications were never submitted because Hatch had disappeared and there was no one to whom they could have been submitted—and it appears to be somewhat disputed whether Ellsworth could have found Hatch and submitted the three payment applications—that may have bearing on whether Ellsworth may still recover interest under the contract.

## VI. Attorney Fees

¶ 45 SPR appeals from the trial court's award of attorney fees below, and Ellsworth

requests we grant it attorney fees on appeal. Given our reversal of several of the trial court's rulings and given our remand, we must vacate the trial court's award of attorney fees because it is no longer clear who the prevailing party is. However, as was the case with the prejudgment interest issue, the attorney fee issue will present itself again on remand and requires brief comment.

■ ¶ 46 It is clear that Utah law requires the prevailing party, and ultimately the court, to allocate the prevailing party's attorney fees among those claims for which it is entitled to an award of attorney fees and those for which it is not. *See A.K. & R. Whipple Plumbing & Heating v. Aspen Constr.*, 1999 UT App 87, ¶ 32, 977 P.2d 518, *cert. denied*, 994 P.2d 1271 (Utah 1999). SPR argues that because Ellsworth is not entitled under the contract to attorney fees for its breach of contract claim—the contract contained no attorney fees provision—Ellsworth and the trial court failed to properly allocate those noncompensable attorney fees related to the breach of contract claim and those compensable fees related to the mechanic's lien claim.

■ ¶ 47 While it is true that under the mechanic's lien statute Ellsworth is not entitled "to attorney fees incurred in pursuing its nonlien claims which were 'completely separate,'" *American Rural Cellular, Inc. v. Systems Commun. Corp.*, 939 P.2d 185, 193 (Utah Ct.App.1997) (citation omitted), the breach of contract claim here was so inextricably tied to the mechanic's lien claim as to warrant grouping these fees together. Indeed, it almost goes without saying that a breach of contract claim is typically such an integral part of a mechanic's lien claim that a party cannot pursue such a claim without also proving the existence of a contract, a payment due under the contract, and a breach of that contract by nonpayment.

### CONCLUSION

¶ 48 We remand this matter to the trial court for further consideration in accordance with this opinion.

¶ 49 WE CONCUR: JUDITH M. BILLINGS and CAROLYN B. McHUGH, Judges.